**BELLSOUTH TELECOMMUNICATIONS, INC.,**
Plaintiff,

v.

**MCIMETRO ACCESS TRANSMISSION SERVICES, INC., et al.,**
Defendants.

BellSouth Telecommunications, Inc., Plaintiff,

WorldCom Technologies, Inc., et al., Defendants.

BellSouth Telecommunications, Inc., Plaintiff,

v.

Intermedia Communications, Inc., et al., Defendants.

BellSouth Telecommunications, Inc., Plaintiff,

v.

e.spire Communications, Inc., et al., Defendants.

Civ. A. Nos. 1:99–CV–0248–JOF, 1:99–CV–0249–JOF, 1:99–CV–0518–JOF and 1:99–CV–0781–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 3, 2000.

Matthew Henry Patton, Robert Peter Marcovitch, John Franklin Beasley, Kilpatrick Stockton, William J. Ellenberg, II, Bellsouth Telecommunications, Inc., Fred McCallum, Jr., Bellsouth Telecommunications, Inc., Atlanta, GA, Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Plaintiff.

Teresa Wynn Roseborough, David Isaac Adelman, Sutherland, Asbill & Brennan, Atlanta, Darryl M. Bradford, John J. Hamill, Jenner & Block, Chicago, IL, Patrick K. Wiggins, Wiggins & Villacorta, Tallahassee, FL, Frank B. Strickland, Mary M. Brockington, Sara Lynn Doyle, Wilson, Strickland & Benson, Suzanne W. Ockleberry, AT & T Communications of the Southern States, Inc., Atlanta, GA, Newton M. Galloway, Dean Richard Fuchs, Newton M. Galloway & Associates, Griffin, Robert S. Bomar, Thurbert E. Baker, William Wright Calhoun, Thomas K. Bond, Harold David Melton, Office of State Attorney General, Atlanta, GA, for Defendants.

Robert David Powell, Assistant United States Attorney, Atlanta, GA, Rachel J. Hines, U.S. Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, for Intervenor.

## *ORDER*

FORRESTER, District Judge.

This matter is before the court on Plaintiff's petitions for judicial review of four orders of the Georgia Public Service Commission ("PSC").

## I. STATEMENT OF THE CASE

### A. *Procedural History*

Plaintiff, BellSouth Telecommunications, Inc. ("BellSouth"), filed the instant actions seeking judicial review, pursuant to 47 U.S.C. § 252(e)(6), of four PSC orders holding that BellSouth must pay reciprocal compensation to its competitors for calls made to Internet service providers ("ISP").[1] BellSouth subsequently filed emergency motions to pay into court the amounts owed under the PSC orders. After a hearing, the court granted these motions. BellSouth then filed motions to stay the PSC orders or, alternatively, to continue filing the amounts owed under those orders into the court's registry. The court denied BellSouth's motions to stay but granted its motions to continue paying sums into the registry of the court, in accordance with the terms of the court's earlier ruling on the emergency motions. On July 29, 1999, the court issued a scheduling order in which it ordered the PSC to file a complete record of the administrative proceedings in the four cases at issue and imposed a briefing schedule on the parties to this dispute. After the scheduling order had been issued, both the United States

---

1. The Defendants include: MCImetro Access Transmission Services, Inc. ("MCI"); WorldCom Technologies, Inc. ("WorldCom"); ICG Telecom Group, Inc. ("ICG"); Nextlink Georgia, Inc. ("Nextlink"); Intermedia Communications, Inc. ("Intermedia"); and e.spire Communications, Inc. ("e.spire"). These Defendants are referred to collectively herein as "the CLEC Defendants." BellSouth has also named as Defendants the PSC, as well as the members of the PSC in their official capacities. The PSC members are referred to collectively herein as "the PSC Defendants."

and MediaOne Telecommunications of Georgia, LLC ("MediaOne") moved to intervene. The court verbally granted the motion of the United States and verbally denied the motion of MediaOne. Finally, on April 4, 2000, the court heard arguments on the issues presented in this case.

### B. *Background*

The Telecommunications Act of 1996 ("the Act" or "the 1996 Act") requires all telecommunications carriers "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers" so that customers of one carrier can call customers of a different carrier. 47 U.S.C. § 251(a)(1). Important provisions in the Act apply specifically to local exchange carriers ("LECs"). Prior to the Act's passage, local telephone service was thought to be a natural monopoly, and states typically granted exclusive franchises in each local service area to a LEC, which owned the equipment that constitutes a local exchange network. *AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). After the Act, however, states "may no longer enforce laws that impede competition, and the incumbent LECs are subject to a host of duties intended to facilitate market entry." *Id.* Among the duties imposed on incumbent LECs ("ILECs") are the obligations "to establish reciprocal compensation arrangements for the transportation of telecommunications," 47 U.S.C. § 251(b)(5), and to execute interconnection agreements with competitor LECs ("CLECs") setting forth the terms by which they will compensate each other for the use of the other's network. *Id.* at § 251(c).

The Act provides that ILECs may voluntarily negotiate the interconnection agreements with CLECs, and any party to the negotiation may request that the state commission charged with such duties may mediate any differences arising in the course of the negotiation. 47 U.S.C. § 252(a). If, within a given time, an agreement is not reached by negotiation or mediation, the Act provides for compulsory arbitration by the state commission. *Id.* at § 252(b). Once an agreement is reached, whether through negotiation or arbitration, it must be submitted to the state commission for approval. *Id.* at § 252(e). If the state commission fails or refuses to act on an agreement, the Federal Communications Commission ("FCC") will then issue an order preempting the state commission and shall assume the state commission's responsibilities under the Act. *Id.* at § 252(e)(5).

Pursuant to the aforementioned obligations, BellSouth entered into four separate interconnection agreements with the CLEC Defendants in late 1996 and early 1997, and each of the agreements was approved by the PSC. Each agreement provided for reciprocal compensation obligations only with regard to "Local Traffic." (Def. Ex. 2, § 5.8.1; Def. Ex. 3, § 2.2.1; Def. Ex. 4, § IV.A–B; Def. Ex. 5, § VI.B). Three of the agreements define "Local Traffic" as "[any] telephone call[s] that originate[s] in one exchange and terminate[s] in either the same exchange, or a corresponding Extended Area Service ... exchange." (Def. Ex. 3, § 2.2.1; Def. Ex. 4, § I.D; Def. Ex. 5, Att. B, ¶ 48). The fourth agreement defined "Local Traffic" as "calls between two or more Telephone Exchange service users where both Telephone Exchange Services bear NPA–NXX designations associated with the same local calling area ...." [2] (Def.Ex. 2, § 1.40). After these agreements were executed, a dispute arose between BellSouth and the CLEC Defendants as to whether the agreements required the payment of reciprocal compensation for calls made to ISPs for ·the purposes of connecting with the In-

---

**2.** An "NPA–NXX designation" is the area code and first three digits of a seven-digit telephone number.

ternet. At the heart of this dispute was whether ISP-bound traffic constitutes "Local Traffic" for purposes of the agreements. Answering this question negatively, BellSouth sent a letter to the CLEC Defendants on August 12, 1997, informing them that BellSouth would not pay reciprocal compensation for calls made to ISPs. (Def.Ex. 19).

Defendants WorldCom,[3] MCI, e.spire, and Intermedia thereafter filed complaints with the PSC alleging that BellSouth had breached the agreements and seeking enforcement of the interconnection agreements so as to require reciprocal compensation for ISP-bound traffic. The PSC sided with the CLEC Defendants and issued four orders ruling that calls made to ISPs are local in nature and fit within the definitions of "Local Traffic" contained in the interconnection agreements. Important to the PSC decisions was the notion that such calls terminate locally at the ISPs, and the PSC found that information services provided by the ISPs were distinct from and irrelevant to the telecommunications service provided by the LEC. *See* WorldCom Order, at 7; *In re Petition of MCImetro for Arbitration of Certain Terms and Conditions of Proposed Agreement with BellSouth Telecommunications, Inc. Concerning Interconnection and Resale Under the Telecommunications Act of 1996*, Order Deciding Complaint, PSC Dkt. No. 6865–U, at 30–31 ("MCI Order"); *In re Complaint of Intermedia Communications, Inc. against BellSouth Telecommunications, Inc. for Breach of Terms of Georgia Partial Interconnection Agreement under Sections 251 and 252 of the Telecommunications Act of 1996, and Request for Relief*, Order Deciding Complaint, PSC Dkt. No. 9920–U, at 3 ("Intermedia Order"); *In re Complaint of e.spire Communications, Inc. Against*

*BellSouth Telecommunications, Inc.*, Order Affirming and Modifying the Hearing Officer's Decision, at 7 ("e.spire Order"). BellSouth then sought relief in this court.

After the initiation of the instant actions, the FCC handed down a ruling relevant to reciprocal compensation for ISP-bound traffic. *See In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Inter–Carrier Compensation for ISP–Bound Traffic*, 14 F.C.C.R. 3689, 1999 WL 98037 (1999) ("ISP Ruling"). The FCC concluded that "ISP-bound traffic is jurisdictionally mixed and appears to be largely interstate in nature," *id.* at ¶ 1, and decided to "analyze ISP traffic for jurisdictional purposes as a continuous transmission from the end user to a distant Internet site." *Id.* at ¶ 13. In so holding, the FCC rejected the idea that "ISP-bound traffic must be separated into two components: an intrastate telecommunications service . . . and an interstate information service . . . ." *Id.* Because reciprocal compensation is mandated under 47 U.S.C. § 251(b)(5) only for local traffic, *id.* at ¶ 26, the FCC's ruling that ISP-bound traffic is jurisdictionally interstate removed such traffic from the reciprocal compensation requirement. Nonetheless, the FCC noted that "parties may voluntarily include this traffic within the scope of their interconnection agreements" as those agreements are "interpreted and enforced by the state commissions." *Id.* at ¶ 22.

On March 24, 2000, the United States Court of Appeals for the District of Columbia Circuit vacated the FCC's ISP Ruling for "want of reasoned decision-making." *Bell Atlantic Tel. Co. v. FCC*, 206 F.3d 1, 2 (D.C.Cir.2000). The court noted that the FCC's ruling "rest[ed] squarely on its decision to employ an end-to-end analysis for

---

3. WorldCom is the successor in interest to MFS Intelenet of Georgia, Inc., the party that actually filed the complaint with the PSC. Defendants ICG and Nextlink, among others, moved to intervene in the WorldCom proceeding. *See In re Complaint of MFS Intele-*

*net of Georgia, Inc. Against BellSouth Telecommunications, Inc., and Request for Relief*, Order Affirming and Modifying the Hearing Officer's Decision, PSC Dkt. No. 8196–U, at 3–4 ("WorldCom Order").

purposes of determining whether ISP-traffic is local" and acknowledged that the FCC "has historically been justified in relying on this method when determining when a particular communication is jurisdictionally interstate." *Id.* at 4. The court vacated the FCC's ruling, however, because the agency had not provided "an explanation why this inquiry is relevant to discerning whether a call to an ISP should fit within the local call model of two collaborating LECs or the long-distance model of a long-distance carrier collaborating with two LECs." *Id.* The court further noted that the FCC's ruling had failed to come to terms with its own regulations. The FCC defines "local telecommunications traffic" as traffic that "originates and terminates within a local service area." *Id.* (citing 47 C.F.R. § 51.701(b)(1)). The FCC defines "termination" as "the switching of traffic that is subject to section 251(b)(5) at the terminating carrier's end office switch to the called party's premises." *Id.* (citing 47 C.F.R. § 51.701(d)). The court explained that "ISPs appear to fit this definition: the traffic is switched by the LEC whose customer is the ISP and then delivered to the ISP, which is clearly the 'called party.'" *Id.* Finally, the court commented that ISPs are information service providers, not telecommunications providers, and indicated that the FCC had failed adequately to account for a line of rulings that rested on "the real differences between long-distance calls and calls to information service providers." *Id.* at 5–6. The court remanded the case to the FCC for further consideration.

## II. DISCUSSION

The instant cases present a maze of constitutional, procedural, and contractual issues. The challenge is to navigate among historic legal structures and emerging legal doctrines when the Congress has provided no maps. In that setting, a few

courts have struggled, as will this one, to provide the parties with a predictable and sensible means of resolving disputes about business relationships that are important to the development of the Internet.

The PSC Defendants contend they are proper parties and argue that the Eleventh Amendment precludes suit against them, that the exception to the Eleventh Amendment established by *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), is inapplicable, and that the case must be dismissed because they are necessary or indispensable parties. Also, the PSC Defendants argue, in the alternative, that the 1996 Act violates the Tenth Amendment by coercing the states into administering a federal regulatory program.[4]

BellSouth contends that the FCC's ruling that ISP-bound traffic is jurisdictionally interstate both undermines the conclusion of the PSC that such traffic terminates locally and requires reversal of the four PSC orders at issue. BellSouth further contends that the District of Columbia Circuit's decision in *Bell Atlantic* does not change that result because the FCC has already indicated that it believes it can provide the requested explanations and reach the same conclusion in a manner that will satisfy that court. The CLEC Defendants, for their part, argue that the *Bell Atlantic* decision completely disposes of BellSouth's position. Moreover, both the CLEC Defendants and the PSC Defendants maintain that the orders at issue are nonetheless valid under the FCC's ISP Ruling because those orders interpreted the interconnection agreements to require reciprocal compensation for ISP-bound traffic, which the FCC indicated was permissible. Finally the parties would have the court review the merits of the PSC's decision.

---

**4.** The United States intervened to address the constitutional issues raised by the PSC Defen-      dants.

### A. Preliminary Issues and Constitutional Challenges

By extending the scope of federal regulation into the field of local telecommunications competition, while simultaneously permitting the state commissions to play a narrow regulatory role in that field, the 1996 Act creates a scheme that the Supreme Court has described as "decidedly novel." *AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 733 n. 10, 142 L.Ed.2d 835 (1999). Some courts have characterized this scheme as "cooperative federalism," where "state commissions can exercise their expertise about the needs of the local market and local consumers, but are guided by the provisions of the Act and by the concomitant FCC regulations and checked by federal court review for consistency with federal provisions." *Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 14 (1st Cir.1999) (citations omitted); *see also Wisconsin Bell, Inc. v. Public Service Comm'n of Wisconsin*, 57 F.Supp.2d 710, 711 (W.D.Wis.1999) (noting that the Act created "new universe of cooperative federalism") (internal quotations omitted). As this case bears out, however, the regulatory framework governing interconnection agreements often produces more vacillation than stability between federal and state interests, and this court thinks that "bipolar federalism" is a more apt description of the system created by the Act. This "bipolar federalism" makes it difficult to discern true congressional intent with regard to the enforcement and construction of interconnection agreements.

Indeed, the Act establishes a quagmire, pushing one further into the analytical abyss with each step toward resolution. To begin with, the Act is unclear as to the precise role state commissions are to play. As indicated, § 252 of the Act provides that state commissions may mediate, arbitrate, and ultimately approve interconnection agreements. The statute does not,

however, expressly proclaim any power on the part of state commissions to enforce and interpret those agreements after they have been approved. Additionally, the Act does not expressly provide for federal judicial review of state commission orders enforcing and interpreting previously approved interconnection agreements. Section 252(e)(6) provides: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and [section 252]." Because § 252 specifically addresses only the process for negotiating, mediating, arbitrating, and approving interconnection agreements, § 252(e)(6) would appear at first blush to concern only determinations made during that process. Some courts, however, have found that the Act implicitly deals with these issues, maintaining that the power to approve interconnection agreements necessarily encompasses the power to interpret and enforce those agreements. *See, e.g., Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas*, 208 F.3d 475, 478 (5th Cir.2000).

█ With regard to these initial questions, the court faces two possibilities: The court can read the statute narrowly in this regard to preclude jurisdiction over the present actions, or, alternatively, the court can agree that § 252(e)(6) provides, implicitly if not expressly, jurisdiction to review the PSC's interpretive orders. The weight of judicial authority appears to lean in favor of the latter approach. Moreover, the FCC itself clearly views the statute as allowing state commissions to enforce and interpret interconnection agreements after they are approved. *See* ISP Ruling, at ¶ 22 (indicating that parties are bound by agreements "as interpreted and enforced by the state commissions").[5] Because con-

---

**5.** Although the ISP Ruling was vacated by the District of Columbia Circuit in *Bell Atlantic,* the reasons for the Court of Appeals' decision did not affect the FCC's conclusion that state

gressional intent appears ambiguous in this regard, the court will show deference to the reasonable interpretations of the administrative agency charged with implementing the Act. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Therefore, determinations made by state commissions under § 252 concern enforcement and interpretation as well as mediation, arbitration, and approval. As a result, interpretation and enforcement decisions constitute "determination[s] under this section" for purposes of § 252(e)(6), and the federal courts consequently have jurisdiction to review orders interpreting and enforcing the interconnection agreements.

Upon making that determination, another question arises: Does § 252(e)(6) require that the state commission, either itself or through its members, be a party to the federal lawsuit? Some courts have answered in the affirmative, finding that "Congress intended that the state commissions be parties to the federal suits reviewing their actions, just as the FCC is a party to suits seeking review of its actions." *MCI Telecommunications Corp. v. Illinois Commerce Comm'n,* 183 F.3d 558, 564, *rehearing granted,* 183 F.3d 567 (7th Cir.1999); *Illinois Bell Tel. Co. v. Worldcom Tech., Inc.,* 179 F.3d 566, 571 (7th Cir.1999). *See also Wisconsin Bell,* 57 F.Supp.2d at 718 (finding that Seventh Circuit precedent required presence of state commission for court to exercise jurisdiction). Of course, a finding that the state commission must be a party immediately raises the very Eleventh Amendment issues currently facing the court.

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the text of the Amendment expressly speaks in terms of restricting the diversity jurisdiction of federal courts by barring suits against states that are brought by citizens of other states or countries, the Supreme Court has repeatedly acknowledged that the Amendment stands "not so much for what it says, but for the presupposition ... which it confirms." *Kimel v. Florida Bd. of Regents,* —— U.S. ——, ——, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). The Eleventh Amendment repudiated the idea "that the jurisdictional heads of Article III superseded the sovereign immunity that the States possessed before entering the Union." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2223, 144 L.Ed.2d 605 (1999). Accordingly, the Eleventh Amendment "effectively confers an immunity from suit" upon both states and state agencies. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

In light of this immunity, the Supreme Court has recognized only two circumstances in which an individual may sue a state directly. First, Congress may abrogate a state's Eleventh Amendment immunity under certain of its constitutional powers. *College Savings,* 119 S.Ct. at 2223; *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114. Second, an individual may directly sue a state when the state waives its sovereign immunity by consenting to suit. *College Savings,* 119 S.Ct. at 2223. Additionally, the Court in *Ex Parte Young* carved out an exception to Eleventh Amendment immunity, allowing suits seeking prospective relief, such as an injunction, to be brought against state officials rather than the states themselves, where those suits challenge the constitutionality of official conduct. *See generally Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Metcalf & Eddy, Inc.,* 506 U.S. at 145,

commissions may construe and enforce inter-

connection agreements under § 252.

113 S.Ct. 684. In recent decisions, however, the Court has increasingly narrowed the scope of these already limited circumstances, presenting strong arguments in favor of applying the Eleventh Amendment in this case to bar suit against the PSC Defendants.

To begin with, the Court's recent jurisprudence makes clear that the Congress could not have abrogated the states' sovereign immunity through the 1996 Act, a statute enacted pursuant to the Commerce Clause. *Cf.* 47 U.S.C. § 151 (creating FCC for "the purpose of regulating interstate and foreign commerce in communication"). In *Seminole Tribe,* the Court expressly overruled prior precedent that had allowed such abrogation under congressional power to regulate interstate commerce. *See Seminole Tribe,* 517 U.S. at 66, 116 S.Ct. 1114 (overruling *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989)). The Seminole Tribe of Florida had sued Florida under the Indian Gaming Regulatory Act ("IGRA"), enacted under the Indian Commerce Clause, which provided for the negotiation of Tribal–State compacts regulating gaming activities conducted by Indian tribes. The IGRA obliged the states to negotiate in good faith with Indian tribes, and it made that obligation judicially enforceable in federal court. The Supreme Court affirmed the dismissal of the lawsuit, holding that "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id.* at 72–73, 116 S.Ct. 1114. Rather, Congress may abrogate a state's sovereign immunity only pursuant to the remedial powers granted by § 5 of the Fourteenth Amendment. *See id.* at 59, 116 S.Ct. 1114; *see also College Savings,* 119 S.Ct. at 2223. Because the 1996 Act is unquestionably premised on the Congress' Commerce Clause powers, not the remedial provisions of the Fourteenth Amendment, the Court's decision in *Seminole Tribe* precludes any argument that the Act abrogates the PSC's Eleventh Amendment immunity in the instant case. *See, e.g., AT & T Communications of South Central States, Inc. v. BellSouth Telecomm., Inc.,* 43 F.Supp.2d 593, 599 (M.D.La.1999); *Wisconsin Bell, Inc. v. Public Service Comm'n of Wis.,* 27 F.Supp.2d 1149, 1155 (W.D.Wis. 1998).

The Court's decision in *College Savings* similarly renders suspect any argument that the PSC implicitly waived its immunity by participating in the Act's regulatory scheme.[6] In *College Savings,* the Court held that an agency of the state of Florida had not constructively waived its Eleventh Amendment immunity, and thereby consented to suit under the Lanham Act, by entering the college finance market and advertising its tuition savings plan. *College Savings,* 119 S.Ct. at 2226–33. After first holding that Florida's sovereign immunity was not validly abrogated by the Trademark Remedy Clarification Act ("TRCA"), which provided that states are not immune from suit in federal court for violations of the Lanham Act, the court turned its attention to *Parden v. Terminal Ry. of Ala. State Docks Dept.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). The *Parden* decision had permitted railroad employees to bring suit in federal court against their employer, a railroad owned and operated by the State of Alabama. The *Parden* Court held that the Federal Employer's Liability Act "authorized suits against the state by virtue of its general provisions subjecting to suit '[e]very common carrier by railroad . . . engaging in commerce between . . . the several States.'" *Id.* at 2226 (quoting 45 U.S.C. § 51 (1940 ed.)) (alterations in original). The *Parden* Court further explained that, because Congress conditioned the right to

---

**6.** There is no contention that the PSC expressly waived its Eleventh Amendment immunity for purposes of this lawsuit.

operate a railroad on amenability to suit in federal court, Alabama had accepted the condition and waived its immunity by operating a railroad in interstate commerce. *Parden,* 377 U.S. at 192, 84 S.Ct. 1207. Noting that subsequent decisions had retreated from *Parden,* and describing that decision's "constructive-waiver experiment" as "ill-conceived," the Court in *College Savings* held that "[w]hatever may remain of our decision in *Parden* is expressly overruled." *College Savings,* 119 S.Ct. at 2228.

Underlying the Court's decision was the notion that waivers of constitutional rights must be unequivocal and voluntary, a concept which bears forcefully upon the present inquiry. Based on several prior decisions that had required an express waiver of Eleventh Amendment immunity to be unequivocal, the Court found "little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation." *Id.* Additionally, noting that "[c]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights," the Court saw no reason to treat the right of state sovereignty any differently than other rights guaranteed by the Constitution. *Id.* at 2229 (internal quotations omitted). Explaining that *Seminole Tribe*'s holding clearly foreclosed abrogation of Eleventh Amendment immunity under Article I, the Court pronounced that "[f]orced waiver and abrogation are not even different sides of the same coin—they are the same side of the same coin." *Id.* Applying this rationale to the instant dispute reveals the inherent problems associated with any constructive waiver argument. Saying that the PSC waived its immunity by participating in the 1996 Act's regulatory scheme is, at bottom, nothing more than assuming consent based upon the PSC's presence in a field subject to congressional regulation. Similarly, finding that Congress intended to deem a state's participation in the scheme as a waiver of Eleventh Amendment immunity is very different from the state itself making "an 'altogether volun-

tary' decision to waive its immunity." *College Savings,* 119 S.Ct. at 2228. Finally, given the Court's pronouncement that forced waiver and abrogation are essentially the same animal, it is worth mentioning that the facts of the instant case bear a striking resemblance to the facts of *Seminole Tribe.* Just as Congress in that case chose to leave to the states certain aspects of the federal regulatory scheme governing Indian gaming, so Congress here has left to the states the primary responsibility for approving, enforcing, and interpreting the mandatory interconnection agreements. Just as the IGRA made the states' obligations judicially enforceable in federal court, so the 1996 Act provides for federal judicial review of decisions made by state commissions. These factual similarities increase the problems associated with finding that the Act does not run afoul of the Eleventh Amendment.

*College Savings* nonetheless left open the possibility that Congress might condition the receipt of a federal gift on a state's waiver of immunity. *See id.* at 2231 (discussing *Petty v. Tennessee–Missouri Bridge Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), and *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). In *Petty,* the Court held "that a bistate commission which had been created pursuant to an interstate compact (and which [the Court] assumed partook of state sovereign immunity) had consented to suit by reason of a suability provision attached to the congressional approval of the compact." *Id.* In *Dole,* the Court concluded "that Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *Id.* The Court in *College Savings* distinguished these cases by noting that they involved gifts to the states, in the form of an interstate compact and federal funds, to which the states would not otherwise be entitled. *Id.*

By contrast, the legislation at issue in *College Savings* threatened the state with "a sanction: the exclusion of the State from otherwise permissible activity." *Id.* at 2231. Utilizing this distinction, BellSouth, the CLEC Defendants, and the United States argue that the 1996 Act bestowed a gift upon the states by affording them the right to engage in activity that would otherwise be impermissible—i.e., regulation in a field preempted by federal law. *See AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 730 n. 6, 142 L.Ed.2d 835 (1999) (indicating that 1996 Act preempts state regulation of local telecommunications competition).

Accepting this argument also proves problematic. First, the 1996 Act does not clearly condition a state's continued regulation over local telecommunications upon a waiver of Eleventh Amendment immunity, as is required to condition a gift or gratuity. In *Dole*, for example, the Court noted that if Congress desired to condition the receipt of federal funds, "it 'must do so unambiguously ..., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Dole*, 483 U.S. at 207, 107 S.Ct. 2793 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). Section 252(e)(6) does not expressly provide for waiver of the state's immunity, and indeed does not mention suits against the state or its agencies at all. As such, a good argument exists that the statute does not provide sufficient notice of a condition such that a state should be deemed voluntarily to have waived immunity simply by participating in the Act's regulatory framework. *Cf. College Savings*, 119 S.Ct. at 2228 ("... [T]here is little reason to assume actual consent based upon the State's mere presence in a field subject to congressional regulation.").

Second, even assuming that the Act clearly conditions continued regulation on a waiver of immunity, the "choice" presented to the states could be considered so coercive as to destroy any voluntariness potentially associated with the waiver. In *College Savings*, the Court recognized that, in certain circumstances, Congress can threaten an activity so severely as to destroy the voluntariness of the state's acceptance of the condition attached. In federal funding cases, for example, the Court noted that "the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *Id.* (quoting *Dole*, 483 U.S. at 211, 107 S.Ct. 2793) (internal quotations omitted). Similarly, the inducement offered by Congress under the 1996 Act could be deemed so coercive as to render the PSC's decision to participate involuntary. As one court has stated: "Upon passage of the 1996 Act, the states were forced to either abide by the federal regulations or cede the power to regulate to the FCC—a classic *Hobson's* choice." *AT & T Communications of the South Central States, Inc.*, 43 F.Supp.2d at 602. Unlike the activity at issue in *College Savings*, which the state "realistically could choose to abandon," *College Savings*, 119 S.Ct. at 2230, the activity in which the state has supposedly "chosen" to engage here is regulation over local industry that has traditionally been considered part of the state's police powers. *AT & T Communications of the South Central States*, 43 F.Supp.2d at 601. Accordingly, despite the 1996 Act's preemptive effect (or perhaps because of it), these cases could be said to present an even more coercive condition than that found in *College Savings*.

Finally, BellSouth, the CLEC Defendants, and the United States urge that the *Young* exception to Eleventh Amendment immunity be applied to exert jurisdiction over the individual PSC members if jurisdiction over the PSC itself is not attainable. As with the doctrines of abrogation and constructive waiver, however, the Court has limited the circumstances in which the *Young* exception can be applied. In *Seminole Tribe*, the Court found *Young* inapplicable because the IGRA set up a

remedial scheme for enforcement of rights bestowed by the statute that imposed a more limited liability upon the state than it would traditionally face under *Young*. Accordingly, the Court found that Congress clearly had not intended the use of *Young* in remedying violations of the IGRA. *Seminole Tribe*, 517 U.S. at 75–76, 116 S.Ct. 1114. Subsequently, in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), the Court rejected the application of *Young* to avoid Eleventh Amendment immunity in a land dispute that affected Idaho's "sovereign interest in its lands and waters." *Id.* at 287, 117 S.Ct. 2028. There are persuasive arguments that the 1996 Act presents a limited remedial scheme, providing for federal judicial review of state commission determinations as the sole remedy available to aggrieved parties, and that the Congress therefore did not intend *Young* to apply against the individual members of the state commissions. *See AT & T Communications of the South Central States*, 43 F.Supp.2d at 602–03; *Wisconsin Bell*, 27 F.Supp.2d at 1160–61. Additionally, as at least one court has noted, suits like those currently before the court are not the typical *Young* type of case. *See Wisconsin Bell*, 57 F.Supp.2d at 713. Rather than seeking a prospective remedy from a state official performing state functions in a way that violates federal law, these suits essentially seek to correct the past decisions of state officials performing federally authorized functions under a federal regulatory program. *See id.*

As can easily be seen from the foregoing discussion, requiring state commissions to be parties to actions brought under § 252(e)(6) necessarily places the 1996 Act on a collision course with the Supreme Court's Eleventh Amendment jurisprudence. The court is cognizant that other courts facing these issues have distinguished the relevant Supreme Court opinions and have finessed the problems raised above. *See, e.g., Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 867–68 (6th Cir.2000) (finding that *Ex Parte Young* provides valid exception to state commission's Eleventh Amendment immunity); *MCI*, 183 F.3d at 564–67 (finding that Congress intended state commissions to be parties to federal lawsuits "just as the FCC is a party to suits seeking review of its actions" and that states constructively waive immunity by accepting to participate in federal scheme);[7] *Bell Atlantic–Delaware, Inc. v. McMahon*, 80 F.Supp.2d 218, 231–34 (D.Del.2000) (finding both constructive waiver and *Young* exception). This court, however, finds the proffered solutions to be not entirely convincing given the Supreme Court's strong stance on preserving the states' Eleventh Amendment rights, and it notes that in some instances these solutions are premised on little more than the *ipse dixit* of the courts creating them. Accordingly, the court sees little reason to set itself and the parties upon a dead-reckoned course into a constitutional maelstrom that might very well lead to reversal if it can avoid doing so. Moreover, allowing these suits to go forward with the PSC Defendants as parties, just to have the Supreme Court eventually declare that it truly means what it has said about the Eleventh Amendment, would place BellSouth in the unfortunate situation of having to possibly relitigate this dispute while all the time paying sums of money under the interconnection agreements.

The source of these problems in large part is an assumption that the state commissions have to be made parties for suits under § 252(e)(6) to proceed. The court notes, however, that "[t]he starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th

---

7. The weight to be afforded to the *MCI* decision is suspect due to the Seventh Circuit's order granting rehearing of the case in light of the Supreme Court's opinion in *College*

Savings. See MCI Telecommunications Corp. v. Illinois Commerce Comm'n, 183 F.3d 567 (7th Cir.1999).

Cir.1999). By drafting the statute as it did, Congress may possibly have intended that state commissions be made parties to actions brought under § 252(e)(6), and it may equally have intended to abrogate the states' Eleventh Amendment immunity or condition participation in telecommunications regulation on a waiver of that immunity.[8] As indicated, however, the statute hardly makes such an intention unambiguous. Indeed, § 252(e)(6) remains altogether silent on the issue, and in the view of this court, that silence provides the key to the statute's proper interpretation. Section 252(e)(6), at bottom, provides for federal judicial review of determinations made by state commissions in the process of creating and implementing interconnection agreements. In the instant cases, the parties seek resolution of a dispute concerning the proper construction of the agreements' reciprocal compensation provisions. These cases, then, dressed down to their essentials, present little more than common law contract disputes in which this court has been asked to review the PSC's interpretation. Moreover, this interpretation constitutes the *only* regulatory function at issue, a function that is undoubtedly quasi-judicial in nature. In these circumstances, the court cannot imagine that Congress intended to condition federal court jurisdiction on the presence of the state commission—a requirement that would squarely implicate the Eleventh Amendment—without clear language expressing such an intent.

■ The court recognizes that this view also runs contrary to conclusions reached by other courts. Most notable are the decisions in *MCI* and *Illinois Bell,* where the Seventh Circuit indicated that state commissions are necessary parties to § 252(e)(6) suits. Those decisions rested essentially on two points: (1) section 252(e)(6) provides for "Review of State commission actions"; and (2) the FCC is party to suits seeking review of its actions. *MCI,* 183 F.3d at 564; *Illinois Bell,* 179 F.3d at 570–71. Neither of these points is persuasive. First, that § 252(e)(6) is captioned "Review of State commission actions" does not necessarily mean that the state commissions must be parties to the suits. Rather, this phrase could mean simply that "Congress envisioned the review of state commission actions to be similar to garden variety appeals from trial courts to appellate courts or to actions for judicial review of private arbitrations." *Wisconsin Bell,* 57 F.Supp.2d at 718. In neither of the mentioned proceedings is the first line decision-maker considered a necessary party to the review of its rulings. *See id.* Second, the plain language of the statute nowhere states or suggests that Congress intended actions brought under § 252(e)(6) to mirror actions reviewing the decisions of the FCC. Indeed, § 252(e)(6) provides an altogether different procedure for review. FCC orders are reviewed by the Courts of Appeals. *See* 47 U.S.C. § 402; 28 U.S.C. § 2342; *see also FCC v. ITT World Communications, Inc.,* 466 U.S. 463, 468, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984). Actions seeking such review are therefore governed by the Federal Rules of Appellate Procedure, which require that the agency that issued the order under review be named as a respondent. Fed. R.App. P. 15(a). Section 252(e)(6) on the other hand provides for review in the district courts, before a single judge rather than an appellate panel, and the Federal Rules of Appellate Procedure do not apply. *See* Fed. R.App. P. 1(a)(1) ("These rules govern procedure in the United States courts of appeals."). Furthermore, the court is aware of no comparable rule that requires the state

---

**8.** Although the 1996 Act was enacted pursuant to Congress' power to regulate interstate commerce, it was signed into law on February 8, 1996, shortly before the Court decided *Seminole Tribe. See* Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.). At the time of enactment, then, *Union Gas* was controlling authority, and Congress may have thought it possessed the power, under Article I, to abrogate the immunity afforded by the Eleventh Amendment.

commissions to be named as parties in suits brought under § 252(e)(6). Accordingly, the court finds that neither the PSC nor its members need be parties to these suits for the court to exercise jurisdiction.

■ Nonetheless, the PSC Defendants are parties to the instant actions and seek dismissal on constitutional grounds. The court concludes, however, that the nature of the constitutional issues involved and the concomitant problems make clear the soundness of the "fundamental and longstanding principle of judicial restraint" requiring "that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Because the PSC Defendants are not necessary to the court's jurisdiction, and because keeping them in these actions could prove far more detrimental to all interests concerned, the court concludes that they should be dismissed from the lawsuit pursuant to Federal Rule of Civil Procedure 21. Rule 21 provides that "[p]arties may be dropped or added by order of the court on motion of any party *or of its own initiative* at any stage of the action and on such terms as are just." Fed. R.Civ.P. 21 (emphasis added). Although the rule is titled "Misjoinder and Non–Joinder of Parties," courts have recognized that "it may be used to organize problematical issues other than joinder problems." *Official Comm. of Unsecured Creditors v. Shapiro,* 190 F.R.D. 352, 355 (E.D.Pa.2000); *see also Grow v. City of Milwaukee,* 84 F.Supp.2d 990, 995–96 (E.D.Wis.2000) (dismissing *sua sponte* named defendant). It is well recognized that the decision to drop a party under Rule 21 "is left to the sound discretion of the trial court," *Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.,* 792 F.2d 1036, 1045 (11th Cir.1986), but that discretion is limited by Rule 19(b) because the court may not proceed without indispensable parties. *See Lenon v. St.*

*Paul Mercury Ins. Co.,* 136 F.3d 1365, 1371 (10th Cir.1998). The court must therefore determine whether the PSC Defendants are indispensable parties to these lawsuits.

Rule 19 prescribes four factors to consider in evaluating the indispensability of a party: (1) to what extent a judgment rendered in the party's absence might be prejudicial to the party or other parties; (2) the extent to which any prejudice can be lessened by shaping relief; (3) whether a judgment rendered in the party's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the party does not remain in the lawsuit. Fed.R.Civ.P. 19(b). The PSC Defendants argue that these factors weigh in favor of a finding of indispensability because the PSC will be severely prejudiced if these lawsuits proceed without it and because BellSouth would have an adequate remedy in state court. These arguments are unavailing. The court perceives no prejudice by allowing these actions to proceed without the PSC Defendants. While there exists a risk that the court may declare the PSC orders to be invalid, a justiciable controversy nonetheless exists because BellSouth and the CLEC Defendants are on opposing sides of that issue. Therefore, the interest of the PSC in having its rulings upheld is adequately represented. Additionally, the court can fashion appropriate relief by issuing a declaration and an injunction binding both BellSouth and the CLEC Defendants, the real parties in interest to the contract dispute before the court. That the PSC would not also be bound is irrelevant because, if the court declares the PSC orders invalid, there is no place for the PSC to go in attempting to enforce the orders but back to federal court. As demonstrated, the 1996 Act preempts the states with regard to local telecommunications competition, *see AT & T Corp.,* 119 S.Ct. at 730 n. 6, and it expressly takes away any state court jurisdiction over the actions of the state commissions. 47 U.S.C. § 252(e)(4); *see also Illinois Bell,* 179 F.3d at 571 (concluding

that federal action is exclusive remedy). As such, the PSC could not enforce its order in state court, and this court's ruling would be binding on any subsequent federal action. The court finds that any relief issued in this case would be adequate to remedy the alleged violations.[9]

For the foregoing reasons, the court concludes that the PSC Defendants are neither necessary nor indispensable parties and that their presence in the instant actions poses problematic constitutional questions that are best avoided. Accordingly, the court *sua sponte* DISMISSES the PSC Defendants from these actions. As a result, the court need not reach the constitutional arguments raised by the PSC Defendants.

### B. *Reciprocal Compensation for ISP–Bound Traffic*

The heart of the present disputes involves two questions: First, did the PSC orders violate federal law, as reflected in the 1996 Act and in the FCC's rules and regulations? Second, did the PSC correctly interpret the interconnection agreements under Georgia law?[10] With regard to the first question, BellSouth contends that the PSC violated federal law, as declared in the FCC's ISP ruling, by concluding that calls made to ISPs terminate locally and therefore are local in nature. Additionally, BellSouth argues that the FCC's determination that ISP-bound traffic is non-local finds its roots in well-established federal precedent that would itself require reversal of the PSC orders. BellSouth then maintains that the conclusions reached by the PSC are contrary to the basic reality of Internet communications. Finally, BellSouth argues that the FCC's ruling that parties may agree to pay reciprocal compensation for Internet traffic does not save the PSC orders because they do not rest on a determination that BellSouth voluntarily so agreed.

At the core of BellSouth's arguments lies the ISP Ruling, which, for a time anyway, made clear that calls to ISPs constitute jurisdictionally mixed, largely interstate traffic. ISP Ruling, at ¶¶ 1, 18–19. Moreover, the FCC expressly rejected the distinction between telecommunications services and information services made by the PSC in the instant orders, concluding instead that, for jurisdictional purposes, ISP-bound traffic is "a continuous transmission from the end user to a distant

---

**9.** The court is aware that the Sixth Circuit has held to the contrary, concluding that without the power to enjoin the state commissions, "federal courts would have little effective remedy for aggrieved plaintiffs, or would subject companies to the intolerable prospect of conflicting commands from federal courts and state regulatory agencies." *Michigan Bell,* 202 F.3d at 868. The court is not persuaded, however, that an order enjoining the parties to the interconnection agreements would prove ineffective or that an invalid command of a state regulatory agency would hinder the federal court's inherent power to enforce its own decisions—decisions that concern an area of federal law in which the states have been preempted.

**10.** There currently exists a circuit split concerning the scope of federal review in this context. The Seventh Circuit has concluded that the scope of review is limited to whether the state commission, in construing and enforcing the interconnection agreements, violated federal law. *Illinois Bell,* 179 F.3d at 571–72. At least three other circuits have taken a broader view of federal jurisdiction under the 1996 Act, concluding that courts should consider *de novo* whether the agreement violates federal law but should consider all other issues, such as compliance with state law, under a more deferential standard. *See, e.g., Southwestern Bell,* 208 F.3d at 482; *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *US West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117 (9th Cir.1999). Having decided that the state commissions have the power to interpret and enforce interconnection agreements and that resort to federal court is the exclusive remedy for such actions, it would be anomalous to limit the court's consideration to federal issues only. Accordingly, the court will review *de novo* the PSC's compliance with federal law and will review the PSC's state law determinations under an arbitrary-and-capricious standard. *Cf. United States v. Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

Internet site." *Id.* at ¶ 13. These conclusions, coupled with the FCC's determination that reciprocal compensation is mandated only for local traffic, *id.* at ¶ 26, make clear that the FCC does not consider reciprocal compensation for ISP-bound traffic to be required under the Act. The District of Columbia Circuit's decision in *Bell Atlantic,* however, has removed the clarity provided by the ISP Ruling, and despite BellSouth's arguments that the FCC thinks it can maintain its conclusion in a manner that satisfies the *Bell Atlantic* court, the fact remains that the ISP Ruling has been vacated on the very grounds that BellSouth uses for support.[11]

■ In any event, the court finds that it need not resolve the debate over whether ISP-bound traffic is local or interstate in nature because, despite BellSouth's statements to the contrary, the PSC permissibly interpreted the interconnection agreements at issue to require reciprocal compensation for calls made to ISPs.[12] This determination is hardly contrary to

federal law. In the ISP Ruling, the FCC unambiguously stated that "[a] state commission's decision to impose reciprocal compensation obligations in an arbitration proceeding—or a subsequent state commission decision that those obligations encompass ISP-bound traffic—does not conflict with any Commission rule regarding ISP-bound traffic." *Id.*[13] As the Seventh Circuit explained: "The FCC could not have made clearer that in the absence of a rule, a state agency's interpretation of an agreement so as to require payment of reciprocal compensation does not necessarily violate federal law." *Illinois Bell,* 179 F.3d at 572. *See also Southwestern Bell,* 208 F.3d 475, 483 (holding that state commission's determination that reciprocal compensation obligations encompass calls to ISPs does not conflict with federal law).

Moreover, the FCC delineated a list of factors that the state commissions may wish to consider in construing the contracts, including: (1) whether ILECS serving ISPs have done so out of intrastate or interstate tariffs; (2) whether revenues as-

11. Indeed, the court in *Bell Atlantic* made the same distinction between providers of telecommunication services and information services relied on by the PSC. *See Bell Atlantic,* 206 F.3d at 5–6.

12. BellSouth's position that the PSC's conclusion did not rest on contract interpretation is belied by the orders themselves. *See* MCI Order, at 31 ("The Commission finds and concludes that ISP traffic is local within the definition of the Interconnection Agreement, so both parties are contractually obligated to pay reciprocal compensation for ISP traffic."); WorldCom Order, at 12 ("... [T]he Commission finds and concludes that the provisions of the [Interconnection] Agreement do govern these matters and do provide that reciprocal compensation must be paid for ISP traffic."); Intermedia Order, at 3 (finding that "the terms of the [Interconnection] Agreement defining 'Local Traffic' and providing for the terms of Local Interconnection are clear and unambiguous in regards to the subject matter of this case" and that BellSouth "must comply with the terms of ... Agreement, which this Commission construes and interprets as requiring reciprocal compensation ... for termination of local calls, including ISP traffic ...."); e.spire Order, at 8

("... The Commission finds and concludes that the provisions of the [Interconnection] Agreement do govern these matters and do provide that reciprocal compensation must be paid for ISP traffic.").

13. That the ISP Ruling has been vacated for want of reasoned decision-making with regard to its use of the "end-to-end" analysis does not mean that its other conclusions are necessarily invalid. As explained by the Fifth Circuit:

The focus of [the *Bell Atlantic*] opinion is the unexplained (or underexplained) use of the "end-to-end" analysis to determine whether calls to ISPs are interstate or intrastate. Given the FCC's hands-off policy, even if the FCC should continue to deem such calls to be *inter* state and should satisfy the D.C. Circuit following remand, we do not view the court's remand as necessarily forecasting a different result on the question of [state commission] jurisdiction over such calls in the context of interpreting and enforcing existing reciprocal compensation agreements. This would be doubly so if the remand eventually results in the FCC's concluding that local calls to ISPs are *intra* state.

*Southwestern Bell,* 208 F.3d at 478 n. 2.

sociated with those services were counted as intrastate or interstate revenues; (3) whether there is evidence that ILECS or CLECS made any effort to meter out ISP-bound traffic or otherwise segregate it from local traffic, particularly as relative to reciprocal compensation; (4) whether ILECS have included calls to ISPs in local telephone charges; and (5) whether ILECs and CLECs would be compensated for ISP-bound traffic if it is not treated as local and subject to reciprocal compensation. *ISP Ruling,* at ¶ 24. The PSC considered many of these same factors in construing the interconnection agreements at issue here. *See, e.g., MCI Order,* at 31 (finding that "BellSouth has at pertinent times treated ISP traffic as local traffic"); *WorldCom Order,* at 8–9 (finding that BellSouth treated calls to ISPs as local pursuant to local exchange tariff and treated revenues associated with ISP traffic as local); *e.spire Order,* at 6 ("BellSouth treats ISPs as local calls in its allocation of costs between intrastate and interstate traffic for state and federal regulatory reporting purposes, in its local tariffs, and in billing its customers."). As such, the court finds that the PSC's determinations, in interpreting and enforcing the interconnection agreements, did not violate or conflict with federal law.

Turning to the second inquiry, the court similarly finds, under the aforementioned arbitrary-and-capricious standard, that the PSC orders do not run afoul of state contract law. Georgia law provides: "The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13–2–3. Thus, unambiguous contracts are to be enforced as written, with the court looking only to the contract itself to find the parties' intent. *Georgia Ass'n of Educators, Inc. v. Paragon Prod., Inc.,* 238 Ga.App. 681, 682, 520 S.E.2d 37 (1999). Where

intent cannot be gleaned solely from the terms of the contract, however, Georgia law provides statutorily prescribed rules of construction to facilitate resolving any ambiguities. O.C.G.A. § 13–2–2; *see also U.S. Enter. v. Mikado Custom Tailors,* 250 Ga. 415, 416, 297 S.E.2d 290 (1982).

As indicated, each of the interconnection agreements at issue provides for reciprocal compensation obligations only with regard to "Local Traffic." (Def. Ex. 2, § 5.8.1; Def. Ex. 3, § 2.2.1; Def. Ex. 4, § IV.A–B; Def. Ex. 5, § VI.B). The term "Local Traffic" is defined in the agreements as follows: (1) "... any telephone call that originates in one exchange and terminates in either the same exchange, or a corresponding Extended Area (EAS) exchange" (Def. Ex. 3, § 2.2.1; Def. Ex. 4, § I.D); (2) "... calls that originate in one exchange and terminate in either the same exchange, or a corresponding Extended Area Service ("EAS") exchange" (Def.Ex. 5, Att.B, ¶ 48); or (3) "... calls between two or more Telephone Exchange service users where both Telephone Exchange Services bear NPA–NXX designations associated with the same local calling area of the incumbent LEC" (Def.Ex. 2, § 1.40). The last definition, which comes from the interconnection between BellSouth and World-Com, is unambiguous, and the parties' intent must therefore be derived from the contract itself. *Paragon,* 238 Ga.App. at 682, 520 S.E.2d 37. There is no dispute that, as determined by the PSC, ISP-bound calls bear NPA–NXX designations associated with BellSouth's local calling area. *See WorldCom Order,* at 5. As such, calls made to ISPs fall within the contractual definition, and the PSC's conclusion to that effect was not arbitrary and capricious. *See id.* (finding that same NPA–NXX designations "alone causes the calls to meet the definition of 'local traffic' contained in Section 1.40 of the ... Agreement, and therefore that reciprocal compensation is owed for the transport and

termination of the calls.").[14]

The other three contracts are not so clear. In each, what constitutes "Local Traffic" turns upon the meaning given to the word "terminate." The agreements neither define this term nor specifically mention the Internet or ISP-bound traffic. Because the meaning of "terminate" cannot be conclusively explained by looking at the contract itself, the decision-maker must resort to the statutory rules of construction. The most immediately pertinent of these is found in O.C.G.A. § 13–2–2(2): "Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." Although not specifically referenced in the other three orders, the PSC's WorldCom Order acknowledges that "as the term has been and is commonly employed in the telecommunications industry, a call placed over the public switched telecommunications network is considered to be 'terminated' when it is delivered to the telephone exchange service number (with the NPA–NXX designation) that has been called, regardless of the identity of the called party." WorldCom Order, at 8. *See also* 47 C.F.R. § 57.701(d) (defining "termination" as "the switching of local telecommunications traffic at the terminating carrier's end office switch, or equivalent facility, and delivery of such traffic to the called party's premises"). As stated by the *Bell Atlantic* court, "[c]alls to ISPs appear to fit this definition: the traffic is switched by the LEC whose customer is the ISP and then delivered to the ISP, which is clearly the 'called par-

ty.'" *Bell Atlantic*, 206 F.3d at 4. Considering the "peculiar meaning" given to the term "terminate" in the telecommunications industry, the court cannot say that the PSC acted arbitrarily or capriciously in concluding that the interconnections agreements required reciprocal compensation for ISP-bound traffic.

Finally, Georgia law provides that all circumstances surrounding the contract may be proved and any ambiguities may be explained. O.C.G.A. § 13–2–2(1). As indicated, the PSC looked to the manner in which BellSouth treats ISP calls for purposes of intrastate or interstate tariffs, revenues, billing, and the manner in which such calls are handled. Moreover, contrary to BellSouth's argument that decades of federal precedent establish that ISP-bound traffic is non-local, the FCC has expressly noted that its "policy of treating ISP-bound traffic as local for purposes of interstate access charges would, if applied in the separate context of reciprocal compensation, suggest that such compensation is due for that traffic." ISP Ruling, at ¶ 25. All of these things suggest strongly that, at the time the interconnection agreements were executed, the parties, including BellSouth, viewed ISP-bound traffic to be local and intended that traffic to be covered by the reciprocal compensation provision of the agreements. Otherwise, it appears that none of the parties would be compensated for handling ISP calls originating from other carriers, a result that this court finds difficult to believe any of the parties would have intended. The contracts do not segregate or set apart ISP-bound traffic in any manner, and the court cannot find that the PSC's

14. BellSouth's efforts, in its reply brief, to recharacterize the PSC's holding in this regard fails. BellSouth quotes portions of the WorldCom Order in an effort to show that the PSC decided the issue solely on the basis that ISP calls are local because a separate call is terminated at the ISP's premises. According to BellSouth, the PSC "made the same point when it said that the fact that ISP traffic calls 'bear NPA–NXX designations [that is, the area code and first three digits of the number]

associated with the same local calling area of the incumbent' *by itself* established that 're-ciprocal compensation is owed.'" Pl. Reply Br., at 15 n. 16 (alterations and emphasis in original). However, when one reads the full sentence, as quoted above, it becomes clear that the PSC did *not* base its conclusions on the inherent local nature of ISP traffic, but rather on the contractual definition of "Local Traffic."

interpretations of the agreements were arbitrary and capricious.

## III. CONCLUSION

For the foregoing reasons, the court finds that the PSC Defendants are not necessary or indispensable parties to the instant actions and DISMISSES them *sua sponte* from these lawsuits. Additionally, the court finds that the PSC orders under review neither violate federal law nor arbitrarily and capriciously interpret the contracts under state law. As such, reciprocal compensation is required under the interconnection agreements for ISP-bound traffic. The court hereby DENIES Bell-South's requests for declaratory and injunctive relief.