GLOBAL NAPS, INC. and MCI Worldcom Communications, Inc. Plaintiffs,

v.

NEW ENGLAND TELEPHONE & TELEGRAPH CO. D/B/A Verizon–Massachusetts, and Commonwealth of Massachusetts Department of Telecommunications and Energy and James Connelly, W. Robert Keating, Paul B. Vasington, Deidre K. Manning, Commissioners of the Commonwealth of Massachusetts Department of Telecommunications and Energy in their official capacity, Defendants.

No. CIV.A.00–10407–RCL # , CIV.A.00–11513–RCL.

United States District Court, D. Massachusetts.

Aug. 27, 2002.

Cameron F. Kerry, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, John C. Ottenberg, Ottenberg & Dunkless LLP, Boston, MA, Alan D. Mandl, Mandl & Mandl LLP, Boston, MA, John R. Harrington, Darryl M, Bradford, Jenner & Block, LLC, Chicaho, IL, Swidler Berlin Shereff Friedman, LLP, Washington, DC, for Plaintiff.

Renee S. Orleans, Theodore C. Hirt, James D. Todd, Jr., U.S. Dept. of Justice,

Civil Div., Washington, DC, Nancy Rue, U.S. Atty's Office, Boston, MA, for U.S.

Daniel J. Hammond, Atty. General's Office, Boston, MA, for Mass. Dept. of Telecommunications and Energy, James Connelly.

MEMORANDUM ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

Before the court is a motion of plaintiff, Global Naps Inc., for summary judgment or in the alternative for a preliminary injunction (Docket # 4) and a motion of plaintiff, MCI WorldCom Communications, for summary judgment (Docket # 25). The defendants, Verizon New England and Massachusetts Department of Telecommunication and Energy ("DTE") have filed cross motions for summary judgment (Docket # 39 and # 43 respectively). All of these motions were referred to Magistrate Judge Joyce London Alexander for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).

Judge Alexander filed her report on July 5, 2001. Findings and Recommendations (Docket # 122). In it, she recommended that I grant both plaintiffs' motions for summary judgment and deny both defendants' cross motions for summary judgment. Such a ruling would have the effect of declaring that certain orders issued by the DTE in May 1999, July 2000, and August 2001 violate federal law, and that an order issued by the DTE in October 1998 does not violate federal law. Details concerning these orders are set out in Judge Alexander's very thorough report. Findings and Recommendations *passim.*

Judge Alexander also recommended that I grant the motion for a preliminary injunction,

> directing the DTE to undertake an analysis of the interconnection agreements to determine whether those agreements give rise to reciprocal compensation for ISP-bound traffic and that proscribes the DTE from enforcing the 1999 DTE Order, the 2000 DTE Order, and the 2001 DTE Order until such time as that analysis is complete.

*Id.* at 30. Both defendants have objected to the report and its recommendations.

After conducting a *de novo* review of the issues raised by the motion, I accept the report and recommendations in part. Thus, the motions for summary judgment of the plaintiffs, MCI WorldCom Communications and Global Naps are GRANTED to the extent that they seek a declaration under 47 U.S.C. § 252(e)(6) that the October 1998 DTE Order complied with federal law and the May 1999, July 2000, and August 2001 orders did not. In making this ruling, I expressly adopt the reasoning set forth by Judge Alexander in the Findings and Recommendations.

■ With respect to Judge Alexander's recommendation that I issue a preliminary injunction, I conclude that the plaintiffs have not made the requisite showing of irreparable harm. *See Philip Morris Inc. v. Harshbarger,* 159 F.3d 670, 673–74 (1st Cir.1998) (setting forth the four prong test to determine if an injunction should be issued). The harm claimed must be of "a substantial injury that is not accurately measurable or adequately compensable by money damages ...." *Id.* A preliminary injunction "is not warranted by a tenuous or overly speculative forecast of anticipated harm. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir.1996). The record here does not es-

tablish any such harm. Moreover, in light of my disposition of this matter, as set forth in the following paragraph, no injunction, as such, is necessary. Therefore, to the extent the Judge Alexander recommends that I issue a preliminary injunction, I respectfully reject the recommendation, and the motion for preliminary injunction is denied.

A district court's jurisdiction under § 252(e)(6) extends only to a determination of whether orders of a state utility commission like those at issue in this case comply with federal law. 47 U.S.C. § 252(e)(6); *see generally Puerto Rico Telephone Co. v. Telecommunications Regulatory Bd. Puerto Rico*, 189 F.3d 1 (1st Cir.1999). Accordingly, having made such a determination in this case, I remand these cases to the DTE for proceedings or deliberations not inconsistent with the rulings herein and with those parts of the Findings and Recommendations that explicate the reasons for granting summary judgment to the plaintiffs and denying summary judgment to the defendants.

SO ORDERED.

**FINDINGS AND RECOMMENDATIONS ON THE MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION BY THE PLAINTIFF, GLOBAL NAPS, INC. (DOCKET # 4), THE MOTION BY THE PLAINTIFF, MCI–WORLDCOM COMMUNICATIONS, INC., FOR SUMMARY JUDGMENT (DOCKET # 25), THE CROSS–MOTION BY THE DEFENDANT, VERIZON NEW ENGLAND, FOR SUMMARY JUDGMENT IN ITS FAVOR AN IN OPPOSITION TO THE PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT (DOCKET # 39), THE CROSS–MOTION FOR SUMMARY JUDGMENT BY THE MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY (Docket # 43)**

**AND**

**THE MOTION BY MCI WORLDCOM, INC. REQUESTING THAT THE COURT SET THE DATE FOR ORAL ARGUMENTS OR FOR STATUS CONFERENCE (DOCKET # 118)**

ALEXANDER, United States Magistrate Judge.

**Introduction**

Civil Action No. 00–CV–10407–RCL, one of the two consolidated cases here, was initiated by the plaintiff, Global NAPs, Inc. ("Global NAPs"), against New England Telegraph and Telephone Company d/b/a Bell Atlantic–Massachusetts ("Verizon")[1] and the Massachusetts Department of Telecommunications and Energy ("DTE") and its Commissioners.[2] In its complaint, Global NAPs· alleges that the DTE violated federal law in interpreting an interconnection agreement it entered with Verizon. Global NAPs now seeks judicial review of the DTE orders interpreting that agreement. More specifically, pursuant to Section 252(e)(6) of the Telecommunications Act of 1996 (the "Act"), Global NAPs requests that the District Court find that DTE Order 97–116–C (May 1999), which does not require Verizon to pay Global NAPs reciprocal compensation for telephone calls bound for the Internet[3] via

**1.** On September 22, 2000, New England Telegraph and Telephone changed its name to Verizon New England, Inc. d/b/a Verizon Massachusetts.

**2.** Global NAPs seeks injunctive relief against the Commissioners of the DTE. For ease of understanding in these Findings and Recommendations, the Court shall use the term "DTE" to refer to both the Massachusetts Department of Telecommunications and Energy and its Commissioners.

**3.** The Internet is "an international network of interconnected computers that enables millions of people to communicate with one another in 'cyberspace' and to access vast amounts of information from around the world." *Reno v. A.C.L.U.*, 521 U.S. 844, 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

Internet Service Providers ("ISPs"),[4] and subsequent DTE orders to the same effect, violate federal law. Global NAPs also requests that the court declare that a prior decision, DTE Order 97–116 (October 1998), which required Verizon to pay reciprocal compensation to Global NAPs for such calls, is valid.

A similar suit, Civil Action No. 00–CV–11513–RCL, in which the plaintiff MCI Worldcom Communications, Inc. ("MCI"), as the successor in interest to MFS Intelenet Service of Massachusetts, Inc., raises almost identical claims against Verizon, was consolidated with the Global NAPs litigation.[5] The consolidated cases were referred to this Court by the District Court (Lindsay, J.) pursuant to 28 U.S.C. § 636(b)(1)(B) for purposes of preparing Findings and Recommendations on the motions for summary judgment previously filed by all parties, and on the request for injunctive relief by Global NAPs.

This Court previously issued its first Findings and Recommendations in this case. Therein, the Court held that to the extent that the motion for summary judgment by the DTE and its commissioners was based on claims of sovereign immunity pursuant to the Eleventh Amendment to the United States Constitution and the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the motion should be denied. The DTE filed a

timely notice of objection, which was rejected by the District Court when it adopted this Court's Findings and Recommendations. No timely appeal of the District Court's order ensued.[6]

The Court now turns to the remainder of the motions for summary judgment. In its motion, MCI seeks the relief requested in its complaint:

1. Review of three orders issued by the DTE in May 1999, July 2000, and August 2001 and a declaration that those orders "are invalid and violate the [ ] Act";

2. An injunction to prohibit the DTE from enforcing those Orders;

3. An order setting aside the May 1999, July 2000, and August 2001 DTE Orders;

4. Reinstatement of an Order issued by DTE in October 1998 requiring Verizon to pay MCI reciprocal compensation for calls MCI carried to ISPs.

*See* MCI's First Amended Complaint for Declaratory, Injunctive and Other Relief, pp. 16–20; MCI's Motion for Summary Judgment, p. 5.

The motion for summary judgment by Global NAPs seeks similar relief. Global NAPs requests:

1. Declarations that DTE erred in the conclusions it sets forth in the May 1999,

---

4. In order to connect to the Internet, a user typically calls an ISP via a seven-digit local number. After reaching the ISP through the "local" call, the caller is directed or channeled to the Internet by the ISP. *See ITC Deltacom Communications Inc.*, 62 F.Supp.2d at 1306. "[ISPs] typically offer modem telephone access to a computer or computer network linked to the Internet. Many such providers ... are commercial entities offering Internet access for a monthly or hourly fee." *American Libraries Ass'n v. Pataki*, 969 F.Supp. 160, 165 (S.D.N.Y.1997). *See also Southwestern Bell Tel. Co. v. Public Utils. Comm'n*, 208 F.3d 475, 477–78 (5th Cir. 2000).

5. In that case, MCI also alleges that the DTE violated federal law in promulgating Orders 97–116–C and 97–116 and seeks review pursuant to Section 252(e)(6) of the Act.

6. The Supreme Court recently confirmed that federal courts have jurisdiction to evaluate the decisions of state regulatory commissions to the extent that those decisions may or may not comport with federal law and that regulatory commissioners in their official capacities do not have immunity from suit on the basis of *Ex Parte Young*. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871, 2002 WL 1008485 (U.S.).

June 2000, and August 2001 DTE Orders and that those orders are vacated; 2. A declaration that the Order issued by DTE in October 1998 "remains in full force and effect"; 3. A declaration that the DTE erred in failing to determine whether the interconnection agreement entered by the parties and an injunction directing the DTE to undertake such an analysis; 4. A declaration that if the DTE finds that reciprocal compensation is not due for ISP calls per the parties' interconnection agreement, that the DTE must establish an alternative compensation mechanism pending the development and implementation of national rules by the Federal Communications Commission ("FCC").

Amended Complaint of Global NAPs, pp. 14–18; Motion of Global NAPs, Inc. for Summary Judgment, or in the Alternative, for Preliminary Injunctive Relief. Verizon and DTE oppose the plaintiffs' motions and seek summary judgment in their favor. Essentially, both Verizon and DTE contend that the DTE acted properly in issuing the May 1999, June 2000, and August 2001 DTE Orders, and aver that the October 1998 was properly supplanted by the latter DTE orders.

For the reasons set forth below, the Court RECOMMENDS that the District Court ALLOW the plaintiffs' motions for summary judgment and DENY the cross-motions for summary judgment by Verizon and DTE. In light of that recommendation, the Court RESERVES the motion requesting a status conference and oral argument to the District Court, which may determine when and whether a conference and/or argument would be beneficial to the adjudication of the dispositive motions.

## RELEVANT BACKGROUND.

The issues presented in the instant motion are of critical importance not only to the parties before the Court but to the public which consumes telecommunications services. To understand them, it is helpful to look at the genesis of the Act, the Act's mandates, and the judicial interpretations of those mandates.

### The Act and its mandate to "interconnect"

The Act is a remarkable statute, arriving in the midst of a remarkable proliferation of consumer-oriented computers and other technological devices.[7] By promulgating the Act, Congress revolutionized the manner in which telecommunications industries in this country are governed.[8]

---

7. The degree to which the borderless, amorphous Internet has entered into American businesses and households in the score of years since 1984 is astounding. Hundreds of millions of the nation's populace have regular access to the Internet from their households. *See generally* Wayde Brooks, "Wrestling over the World Wide Web: ICANN's Uniform Dispute Resolution Policy for Domain Name Disputes," 22 Hamline J. Pub.L. & Pol'y 297, 297–99 (2001); Christopher Paul Boam, "The Internet, Information and the Culture of Regulatory Change: A Modern Renaissance," 9 CommLaw Conspectus 175, 175–76 (2001) (citations omitted); Andy Johnson–Laird, "The Anatomy of the Internet meets the Body of the Law," 22 U. Dayton L.Rev. 465, 466–69 (1997). Notwithstanding Chomsky's suggestion that the Internet is an "elite organiza-

tion" that does not reach the larger global community, it permeates the American culture, courts, economy, and educational systems.

8. Some have suggested that the Act was an example of the deregulation zeitgeist that pervaded the last decades of the 21st century. The notion of "deregulation" in the context of the Act and telecommunications industries, however, is not accurate. Although the Act radically altered the manner in which telecommunications are regulated, the *sin qua non* of the Act is regulation, including a plethora of new rules, requirements and legal frameworks. *See generally* Joseph D. Kearney and Thomas W. Merrill, "The Great Transformation of Regulated Industries Law," 98 Co-

*Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston,* 38 F.Supp.2d 46, 50 (D.Mass.), *aff'd,* 184 F.3d 88 (1st Cir.1999).

With the advent of integrated telephone service at the turn of the twentieth century, local telephone companies initially competed for customers in their geographic areas. *Bellsouth Telecommunications, Inc. v. MCImetro Access Trans. Servs., Inc.,* 278 F.3d 1223, 1226 (11th Cir.2002) (citation omitted). Those telephone companies refused to cooperate with one another in connecting their respective customers, leading to consumer dissatisfaction and, eventually, the emergence of a particular company to serve the telephonic needs of a community. *Id.* These "natural monopolies" were supported by the rudimentary physical limitations imposed in providing telephone service via underground cables and telephone poles. *Id., citing* Stephen Breyer, *Regulation and Its Reform,* 291–92 (1982). With the passage of the Communications Act of 1934, Congress attempted to "harness" those monopolies through some regulation, but largely left oversight of the telephone companies to state commissions. *Id.*

For most of the last century, the federal and state governments disfavored direct competition amongst the telephone service providers and permitted them to maintain monopolistic fiefdoms over blocs of individual, public and corporate consumers within their defined geographic areas. *Cablevision of Boston, Inc.,* 184 F.3d at 97; *AT & T Communications of the Southern States, Inc. v. Bellsouth Telecommunications, Inc.,* 229 F.3d 457, 459 (4th Cir.2000); *New England Tel. & Tel. Co. v. Conversent Communs. of R.I., LLC,* 178 F.Supp.2d 81, 83–84 (D.R.I.2001); *Bellsouth Telecommunications, Inc. v. MCI Metro Access Trans. Servs., Inc.,* 97 F.Supp.2d 1363, 1365 (N.D.Ga.2000), *rev'd on other grounds,* 278 F.3d 1223 (11th Cir.2002). The Act radically altered the protectionist scheme that cloaked the monopolies from the forces of free enterprise.

The regulatory shift embodied in the Act is rooted in the exponential advances in the telecommunications arena. As technology marched through the twentieth century, it brought developments far beyond the imagination of Depression-era legislators. The rise of fiber optics, cellular and mobile telephones, and the Internet fundamentally altered the way in which Congress, policymakers, and the business world viewed the industry. *See, generally, Bellsouth Telecommuns.,* 278 F.3d at 1226–27. Regulators eventually began to believe that the most efficient manner of reigning the industry and serving the public was one in which the market played a role. Indeed, the philosophy underlying the Act is one of classic American market theory. Congress and the executive branch believe that "vigorous competition [within the telecommunications industry] will serve consumers by providing wider choices, better service, and lower prices." *Cablevision of Boston, Inc.,* 38 F.Supp.2d at 50 (citation omitted). *See also id.* at 63; *Cablevision of Boston, Inc.,* 184 F.3d at 97–98; 47 U.S.C. § 251(c)(2)(A); 1996 U.S.C.C.A.N. (110 Stat. 56) 10, 11 (noting that the Act was intended to "secure lower prices ... higher quality services ... and [to] encourage the rapid deployment of new telecommunications technologies"). Rather than supporting the monopolies, the Act forbade the states from enforcing laws that impeded competition with them.[9] *MCI*

lum. L.Rev. 1323, 1324–25, 1404–05, and *passim* (1998).

9. The spark of the telecommunications revolution came in 1989 when the New York Public Service Commission permitted competition in the long-distance telephone business. That radical departure from the norm gave rise to a populist wave of similar measures that led 29 states to permit similar competi-

*Metro Access Trans. Servs.*, 97 F.Supp.2d at 1365, *citing AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). In the wake of the Act, regional monopolies were subject to the full forces of free enterprise and capitalism—a dramatic watershed in how Congress viewed the telecommunications industries in this country, *see generally Cablevision of Boston, Inc.*, 184 F.3d at 97, *citing* Kearney and Merrill, *supra*, and how consumers receive telecommunications services.

To insure the injection of competition into the telecommunications industry, the Act facilitates the entry of other telecommunications entities into the market to compete vigorously with the former monopolies. The Act forces pre-existing regional monopolies, now monikered as "incumbent local exchange carriers" or "ILECs," to enter contractual agreements with younger telecommunications companies that had not been protected pursuant to the prior regulatory rubric. Those entities are typically referred to as "competing local exchange carriers" or "CLECs." *See* 42 U.S.C. §§ 251(a), (b)(5), (c); *AT & T Communs. of the Southern States*, 229 F.3d at 459; *Bellsouth Telecommunications, Inc. v. ITC Deltacom Communications, Inc.*, 62 F.Supp.2d 1302, 1305–06 (M.D.Ala.1999); *Mich. Bell Tel. Co. v. MFS Intelenet of Mich.*, 16 F.Supp.2d 828, 830 (W.D.Mich.1998). By imposing a duty on each telecommunications carrier "to interconnect directly or indirectly" with other telecommunications carriers, the Act gives rise to "interconnection agreements." *See ITC Deltacom Communications*, 62 F.Supp.2d at 1305.

Interconnection agreements are expected to define what compensation is due to each carrier for the "transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). The process by which parties enter into interconnection agreements has been described by other courts:

> [Pursuant to] Sections 251 and 252 of the Act, [ILECs] have the duty to negotiate in good faith the terms and conditions of agreements regarding facilities access, interconnection, resale of services, and other arrangements contemplated by the Act. Section 252 provided that parties may enter into agreements either voluntarily or through arbitration with a state public utility commission. If the parties are unable to reach an agreement voluntarily, either party may petition the state public utility commission for arbitration. A final interconnection agreement, whether negotiated or arbitrated, is reviewed by the state commission in order to determine whether it complies with the Act.

*Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 1998 WL 419493, *2 (N.D.Ill.) (internal citations omitted), *aff'd*, 179 F.3d 566 (7th Cir.1999). *See also ITC Deltacom Communications*, 62 F.Supp.2d at 1305–06. Thus, the interconnection agreement represents the parties' negotiated outcome to such subjects as the CLEC's access to the ILEC's infrastructure and the terms of that access, including any fees charged by one to the other.

## Reciprocal compensation provisions in interconnection agreements

"Reciprocal compensation is the principle by which interconnected telecommunications companies compensate one another for calls their customers initiate but which must be terminated by the competitor telecommunications company." *Mich. Bell Tel. Co.*, 16 F.Supp.2d at 831 n. 2. *See also Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 501 (7th Cir.1998) ("If a

---

tion by 1996. Congress borrowed heavily from these states' commissions' work in drafting and enacting the Act. Thomas W. Bonnett,

"Is ISP–Bound Traffic Local or Interstate?," 53 Fed. Comm. L.J. 239, 245–46 (2001).

subscriber of Company A calls a subscriber of Company B, then A must share with B some of the revenues A collects from its subscriber, to compensate B for the use of its facilities."), *cert. granted sub nom. Mathias v. WorldCom Techs., Inc.*, 532 U.S. 903, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001), *cert. dismissed as improvidently granted*, 122 S.Ct. 1780, *and cert. denied sub nom. Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, —— U.S. ——, 122 S.Ct. 2318, 152 L.Ed.2d 1071 (2002). As Judge Coar more fully explicates:

> Section 251(b)(5) of [the Act] provides that all LECs have a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." The corresponding regulations define "reciprocal" compensations as an "arrangement between two carriers ... in which each of the two carriers receives compensation from the other carrier for the transport and termination of each carrier's network facilities of local telecommunications traffic that originates on the network facilities of the other carrier." The reciprocal compensation system functions in the following manner: a local caller pays charges to her LEC which originates the call. In turn, the originating carrier must compensate the terminating LEC for completing the call.
>
> Reciprocal compensation applies only to "local telecommunications traffic." Local telecommunications traffic is defined as traffic that "originates and terminates within a local service area established by the state commission."

*WorldCom Techs., Inc.*, 1998 WL 419493 at *4 (internal citations omitted). *See also* 47 U.S.C. § 251(b)(5); 47 C.F.R. § 51.701(e).

The theory of reciprocal compensation is seemingly simple: when telecommunications traffic originates and terminates within a local area, reciprocal compensation is due. The application of the reciprocal compensation rule to the Internet-saturated consumer market, however, raises interesting and complex issues that quickly belie any sense of legal, technological, or economic simplicity:

> If the computer user [consumer] uses one local telephone carrier and the ISP uses a different local telephone carrier, then one must determine if the call is subject to reciprocal compensation. If the call is considered from the computer user to the ISP (i.e., originating and terminating in the local area), then the call would be local and could be subject to reciprocal compensation. If the call is considered on an end to end basis (i.e., an e-mail from the computer user, via the ISP, to a friend across the country) then the call would not terminate in the local area and would not be subject to reciprocal compensation. To further complicate matters, a call could be from a computer user, via the ISP, to a neighbor down the street. This traffic obviously originates and terminates in the local area. *See In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3694, 1999 WL 98037 (1999), *vacated, Bell Atlantic Tel. Co. v. FCC*, 206 F.3d 1, 3 (D.C.Cir.2000) (describing interstate and intrastate traffic).

The characterization of ISP-bound traffic determines how much money some carriers receive and how much other carriers pay. Internet calls tend to be longer than average local calls and ISPs do not "call back" at the same volume, if at all. The difference in the calling pattern of regular telephone users and Internet telephone users creates an imbalance that disrupts a basic assumption behind reciprocal compensation: that the carriers' interconnection use will be roughly balanced. In other words, if ISP-bound traffic is local, some incumbent local exchange carriers are

forced to compensate competing carriers with ISP clients, without very much likelihood that a similar payment will inure to the incumbent's benefit. *See, e.g., Southwestern Bell Tel. Co. v. Connect Communications Corp.,* 225 F.3d 942, 945 (8th Cir.2000) (describing the economics at play). "Internet usage has distorted the traditional assumptions [about interconnection] because traffic to an ISP flows exclusively in one direction, creating an opportunity for regulatory arbitrage and leading to uneconomical results." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* F.C.C. 01–131, at 12 (April 18, 2001). *Conversent Communications,* 178 F.Supp.2d at 85.

Put another way, because ISP-bound calls are "not quite local" and "not quite long-distance," *Bell Atlantic Tel. Co. v. FCC,* 206 F.3d 1, 5 (D.C.Cir.2000), they do not fit neatly within the reciprocal compensation paradigm. Not surprisingly then, CLECs and ILECs tend to see calls to ISPs as fitting the category that best fits their own economic interests.

In the instant case, the parties are at odds over the DTE's interpretation of

federal law governing reciprocal compensation and the portions of the interconnection agreements the parties entered previously which address reciprocal compensation. Verizon insists that in light of various rulings by the FCC, federal courts and state commissions around the country (including DTE), it need not provide reciprocal compensation to MCI and Global NAPs. Not surprisingly, MCI and Global NAPs disagree and marshal their own resources of judicial and regulatory rulings to support their position.

In addressing the parties' asseverations here, it is necessary for this Court to glean the law's characterization of ISP-bound traffic. Unfortunately, despite the fact that the FCC and the federal courts have churned through the waves of litigation that followed in the wake of the Act, the waters remain somewhat muddied and choppy.[10] *Conversent Communications,* 178 F.Supp.2d at 85.

### The issue of whether ISP bound calls are local calls for purposes of the Act

In 1996, the FCC ruled that reciprocal compensation is due only for local traffic, but as the court in *Coversent Communications* makes clear, that ruling did not clari-

10. Counsel in this case have repeatedly attempted to inform both this Court and the District Court of new developments in the law. Indeed, there have been a plethora of unsolicited filings by the parties ostensibly intended to give the Court notice of new decisions as they were being released. The legal and economic contexts of this case are such that the parties may have felt a particular need to indicate that another case had been decided, but the Court notes that it, too, was tracking the developments as they unfolded. Understandably, the parties seek resolution of this litigation. But a decision based on faulty or unproven legal premises is of no more benefit to them than the absence of any decision at all. This Court has moved cautiously but purposefully in following the law, as the law has coagulated, in the hope of providing the District Court and the litigants with a

meaningful analysis of the issues presented. As commentators and other courts have noted, the complexities of the litigation presented here are not insignificant. *See, e.g.,* Monroe E. Price and John F. Duffy, "Technological Change and Doctrinal Persistence: Telecommunications Reform in Congress and the Court," 97 Colum. L.Rev. 976, 994–95 (1997)("[f]or at least as long as Congress has been rewriting the communications laws, courts have been struggling with the implications of technological change for their media-related statutory and constitutional jurisprudence"); *MCI Metro Access Trans. Servs.,* 97 F.Supp.2d at 1364 ("[t]he instant cases present a maze of constitutional, procedural and contractual issues. The challenge is to navigate among historic legal structures and emerging legal doctrines when the Congress has provided no maps.").

fy sufficiently whether traffic destined for an ISP fell within the definition of local traffic. Thus, three years later, in 1999, the FCC issued a declaratory ruling that was intended to alleviate the confusion over whether an ISP-bound call fell within that definition. *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 1999 WL 98037 (1999) (hereinafter "the 1999 FCC Ruling"), *vacated, Bell Atlantic Tel. Co.*, 206 F.3d at 3. Therein, the FCC refused to Solomonically separate an ISP-bound call into two distinct components (one portion being the intrastate segment of the call that connects the consumer to the ISP and the other being the interstate portion between the ISP and sites on the Internet). *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Texas*, 208 F.3d 475, 478 (5th Cir.2000). Rather, the FCC used the "end to end" jurisdictional analysis to reason that calls to an ISP did not conclude upon reaching the ISP. Instead, the FCC found that the call did not terminate until after it had passed through the ISP and reached its final destination. 14 F.C.C.R. at 3697.

Notably, although the FCC concluded for purposes of its own rules and regulations on reciprocal compensation that "calls to ISPs constitute jurisdictionally mixed, largely interstate traffic," 208 F.3d at 483; *see also Global NAPS, Inc. v. F.C.C.*, 291 F.3d 832, 2002 WL 1162430, * 2 (D.C.Cir.), the FCC's decision lacked comprehensive definitiveness by propagating a "hands-off" approach toward state commissions and by refusing to interfere in their decisions on whether reciprocal compensation provisions should be applied to interconnection agreements. *Southwestern Bell Tel. Co.*, 208 F.3d at 478. Thus, the 1999 FCC Ruling expressly permitted state commissions to continue to decide whether reciprocal compensation was due to a carrier for ISP-bound traffic, *Conversent Communications*, 178 F.Supp.2d at 85, *citing* 14 F.C.C.R. at 3703–07; *Bell Atlantic Tel. Co.*, 206 F.3d at 3, particularly in cases where there was explicit or implicit provision to that effect in any interconnection agreement previously entered by the parties. *Global NAPS*, 291 F.3d 832, 2002 WL 1162430 at * 2, *citing Verizon Md.*, —— U.S. at ——, 122 S.Ct. at 1757; *Southwestern Bell Tel. Co.*, 208 F.3d at 483 (citations omitted); *Ill. Bell Tel. Co.*, 179 F.3d at 572.

Approximately one year later, the Court of Appeals for the District of Columbia vacated the 1999 FCC Ruling. *Bell Atlantic Tel. Co. v. FCC*, 206 F.3d 1 (D.C.Cir. 2000). In rather harsh fashion, the court described a "want of reasoned decision making" in the FCC's order—language specifically directed at the FCC's reliance on end-to-end analysis. *Id.* at 3 (emphasis omitted). In vacating, however, the court did not foreclose the notion that the FCC's ruling, as opposed to its stated rationale for the ruling, could stand. *See id.* at 6. Nor did the appellate court address the notion that state commissions had the authority to decide that reciprocal compensation was (or was not) due. *See id.* at 3, 9. Thus, significant questions about the propriety of reciprocal compensation for ISP traffic remained unanswered.

More than a year after the circuit court's ruling vacating the FCC's order, the FCC issued another decision on the issue, finding more definitively that ISP-bound traffic was not subject to reciprocal compensation. *Conversent Communications*, 178 F.Supp.2d at 86, *citing In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, F.C.C. 01–131, at 13 (April 18, 2001) (hereinafter "the 2001 FCC Ruling") and 47 C.F.R. § 51.701 (2001). The FCC further ruled that it would maintain its authority to promulgate regulations governing ISP-bound traffic, and prohibited the states' commissions from making deci-

sions regarding compensation due to a telecommunications carrier for such traffic. The 2001 FCC Ruling at 39. In so doing, however, the FCC only countenanced prospective rulings. It neither invalidated previously negotiated interconnection agreements that permit reciprocal compensation for ISP-bound traffic nor vacated states' commissions' decisions that found such compensation to be due. *Conversent Communications,* 178 F.Supp.2d at 86, *citing* the 2001 FCC Ruling at 36–37. The state of the law was thereby left quite unsettled, at least as the instant parties are concerned.

**The Parties' Agreements and DTE Orders at Issue in the Litigation**

In order to apply the law to the instant case, it is necessary to review the parties' respective agreements and the DTE's rulings on those agreements. Those histories are fully intertwined, but began with the interconnection agreement between MCI and Verizon.[11] That agreement was entered after negotiation and, in accordance with the Act, subsequently approved by the DTE on October 7, 1996.[12]

The MCI–Verizon Agreement provides that reciprocal compensation will be granted to each party from the other for local calls.[13] *See* MCI–Verizon Agreement, Section 5.8.1–2, at 13. As indicated *supra,* at the time that the agreement was entered, the 1996 FCC Ruling was in place, *Coversent Communications,* 178 F.Supp.2d at 84, and it is undisputed that Verizon initially paid MCI reciprocal compensation

11. The agreement is entitled "Interconnection Agreement Under Sections 251 and 252 of the Telecommunications Act of 1996, dated June 26, 1996, by and between New England Telephone and Telegraph Company and MFS Intelenet of Massachusetts, Inc." ("MCI–Verizon Agreement").

12. In passing the Act, Congress revised the regulatory regime. Regulatory governance no longer rested entirely with state utility commissions (as it had before 1996), but rather, was predicated on "a unique shared scheme" of "cooperative federalism" in which state utility commissions and the FCC play "important, but not always clear cut, roles ...." *Conversent Communications,* 178 F.Supp.2d at 83 (citations omitted). *See also Puerto Rico Tel. Co. v. Telecommunications Reg. Bd.,* 189 F.3d 1, 13–14 (1st Cir.1999); Philip J. Weiser, "Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecommunications Act," 76 N.Y.U. L.Rev. 1692 (2001). In the new regulatory regime, the parties are free to negotiate their contract entirely on their own or with mediation and arbitration with the state regulatory agency. *Conversent Communications,* 178 F.Supp.2d at 84 (citations omitted). In either event, the state regulatory agency must then review the agreement and determine that it complies with the Act and other pertinent FCC regulations. *Id.* Should the state authority refuse to act on the parties' agreement, the FCC may assume the state commission's responsibilities. *Id.* Thus, although state regulators retain some responsibility and authority in the post-Act scheme, they are nevertheless subservient to the FCC, which maintains ultimate authority over the state commissions. *See id.* and citations therein.

13. Pursuant to the MCI–Verizon agreement, reciprocal compensation only applies to the transport and termination of "local traffic." MCI–Verizon Interconnection Agreement, §§ 5.8.1–5.8.2. Local traffic, in turn, is variously defined as those calls which originate and terminate within a given "local access and transport area" ("LATA"). The definition of a LATA in the MCI–Verizon Interconnection Agreement specifically excludes various types of calls, including "switched exchange access service" calls. Switched exchange access service calls include long distance calls within the Commonwealth of Massachusetts or on an interstate basis, "toll free calls" (such as "800" or "888" calls), and calls which require payment for access to the desired party (for example, "900" calls). *See id.* at §§ 1.3.8, 1.60, 5.8.3, 6.3. Notably, ISP-bound calls are not within the list of calls specifically excluded from LATA calls by the definition of switched exchange access service calls. *See id.* at § 1.60.

for calls to ISPs pursuant to the "local traffic" portion of the agreement.

In April of 1997, however, Verizon unilaterally discontinued such payments contending that calls to ISPs were not within the scope of the reciprocal compensation agreement because they were interstate in nature. When efforts to resolve the dispute failed, MCI brought a complaint before the DTE seeking a ruling that per the interconnection agreement, Verizon must pay MCI reciprocal compensation for calls MCI carried to ISPs for Verizon's consumers.

At or around that same time, Verizon and Global NAPs entered their interconnection agreement.[14] The parties treat that agreement as one that is identical to the MCI–Verizon agreement for purposes of reciprocal compensation,[15] and thereby imports the ambiguity in the text that does not clearly set forth whether ISP traffic is subject to reciprocal compensation. Despite the fact that calls to ISPs would generate millions of dollars in reciprocal compensation fees (and damages here), Global NAPs and Verizon evidently agreed to disagree on whether such calls were within the scope of reciprocal compensation. Instead of resolving the ambiguity, they agreed that Verizon would pay Global NAPs reciprocal compensation for the ISP-bound traffic if Verizon made such payments to MCI pursuant to the MCI–

Verizon agreement. *Global NAPS,* 291 F.3d 832, 2002 WL 1162430 at * 2.

On October 21, 1998, MCI met with success in its efforts at the DTE. In an order entitled *In re WorldCom, Inc.,* D.T.E. # 97–116 (October 1998) (hereinafter "the 1998 DTE Order"), at p. 11, the DTE ruled that Global NAPs and MCI should receive reciprocal compensation for calls to ISPs pursuant to the respective interconnection agreements.[16] With the 1998 DTE Order in place, Verizon apparently resumed reciprocal compensation payments to MCI and began making similar payments to Global NAPs. *Global NAPS,* 291 F.3d 832, 2002 WL 1162430 at * 2. That resolution, however, was short-lived.

In the wake of the 1999 FCC Ruling, Verizon returned to the DTE and requested that the DTE reverse the 1998 DTE Order. *See id.* at *3. Verizon also requested that the DTE declare that it had no obligation to make reciprocal compensation payments to other carriers for ISP traffic, and stopped making such payments to Global NAPs and MCI. *Id.* This impasse led Global NAPs to file its own complaint against Verizon with the DTE in mid-April 1999. Therein, Global NAPs averred that it (like MCI) was entitled to reciprocal compensation payments for calls terminating to ISPs.

---

**14.** The agreement between Verizon and Global NAPs is entitled "Interconnection Agreement Under Sections 251 and 252 of the Telecommunications Act of 1996, April 25, 1997, by and between New England Telephone and Telegraph Company and Global NAPs of Massachusetts" (hereinafter "the Global NAPs–Verizon Agreement"), found in Appendix of Verizon to the Memorandum in Support of Its Motion for Summary Judgment (Docket # 41), Section 2.

**15.** This Court notes, however, that there are also notable differences in the parties' negotiations and course of dealing. For example,

Verizon presents a letter dated April 15, 1997—prior to the submission of the agreement to the DTE for approval—that states expressly that Verizon shall not pay reciprocal compensation for local traffic. Letter from Bruce P. Beausejour to William J. Rooney, Jr., Esq., dated April 15, 1997, found in the Appendix of Verizon to Its Motion for Summary Judgment.

**16.** That ruling was predicated on the notion that ISP-bound traffic was essentially two distinct "calls": a local call to the ISP and an information service call when the ISP connects the consumer with the Internet. *Id.*

On or about May 19, 1999, the DTE vacated its 1998 DTE Order requiring reciprocal compensation for ISP-bound calls. *In Re MCI WorldCom, Inc.,* DTE 97–116–C (May 19, 1999) (hereinafter "the 1999 DTE Ruling"). In so doing, the DTE apparently believed that its prior order was invalidated and nullified by the rationale underlying the 1999 FCC Ruling. *Id.* at 20–25. The DTE declared that in light of the 1999 FCC Ruling, "nothing in either its own rules or those of the FCC required Verizon to pay reciprocal compensation for Internet-bound traffic." *Global NAPS,* 291 F.3d 832, 2002 WL 1162430 at * 3. In so finding, the DTE did not decide whether reciprocal compensation might be due per the interconnection agreements Verizon entered with MCI, Global NAPs, and other carriers. *Id.* Rather, the DTE simply acknowledged that there was a question as to whether the contractual language encompassed reciprocal compensation for calls to ISPs—"a now-unresolved dispute"—but did not attempt to answer that question. *Id.*

The plaintiffs' efforts to have the DTE reconsider the 1999 DTE Order were unsuccessful. On February 25, 2000, the DTE denied all motions to reconsider the 1999 DTE Order, and dismissed as moot Global NAPs' related complaint. The 1998 DTE Order still without force, Verizon continued to refuse to make payments for reciprocal compensation to MCI and Global NAPs for ISP-bound calls initiated by Verizon's customers and terminated on the plaintiffs' networks.

After the 1999 FCC Ruling was vacated, *Bell Atlantic Tel. Co., supra,* the DTE again refused to re-enter the fray, essentially stating that the ongoing evolution of controlling law was too nebulous a body upon which to make decisions, and that the most "prudent course" was to await further FCC rulings. *Order Denying Global NAPs, Inc.'s Motion to Vacate the Department of Telecommunications and Energy's Orders, DTE 97–116–C and DTE 97–116–D/99–39 and to Reinstate DTE 97–116* (July 11, 2000), at p. 12, 15. Thus, the DTE maintained the rule that no reciprocal compensation was due to the plaintiffs. *Id.* Things remained as such through the remainder of 2000, and into 2001.

In April 2001, the FCC issued another ruling on the issue of reciprocal compensation for ISP-bound traffic. *In Re Implementation of Local Competition Provisions of the Telecommunications Act of 1996, Intercarrier Compensation for ISP–Bound Traffic, Order on Remand and Report and Order* (April 27, 2001) (hereinafter the "2001 FCC Remand Order"), 16 F.C.C.R. 9151, 9189 (2001). In that order, the FCC, relying on statutory construction and analysis (rather than the end-to-end jurisdictional analysis it previously had employed), again concluded that ISP-bound telephone traffic is not within the scope of reciprocal compensation agreements. For purposes here, it is not necessary to dissect the FCC's analytic process and outcome beyond mentioning that the FCC now views ISP-bound telephone traffic as "information access" traffic—traffic that is excluded from reciprocal compensation.[17] *See, e.g.,* 47 U.S.C. §§ 251(b)(5) and (g).

What is significant to the instant case is the fact that the FCC, in issuing its 1999 rulings, again expressly reiterated that "[n]othing in [the] Declaratory Ruling ... should be construed to question any determination a state commission *has made,* or may make in the future, that parties have agreed to treat ISP-bound traffic as local

17. Pursuant to that order, the FCC concluded that each carrier was to use a "bill and keep" system wherein each carrier was to recover its own costs from the consumer rather than from other carriers. *See WorldCom, Inc. v. F.C.C.,* 288 F.3d 429, 431 (D.C.Cir.2002).

traffic under existing interconnection agreements." 14 F.C.C.R. 3689 at ¶ 24 (emphasis furnished). Additionally, the FCC stated:

"[s]tate commissions considering what effect, if any, this Declaratory Ruling has on their decisions as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic might conclude, depending on the bases of those decisions, that it is not necessary to re-visit those determinations. We recognize that our conclusion that ISP-bound traffic is largely interstate might cause some state commissions to re-examine their conclusion that reciprocal compensation is due to the extent that those conclusions are based on a finding that this traffic terminates at an ISP server, *but nothing in this Declaratory Ruling precludes state commissions from determining, pursuant to contractual principles or other legal or equitable considerations, that reciprocal compensation is an appropriate interim inter-carrier compensation rule pending completion of the rulemaking we initiate below.*"

*Id.* at ¶ 27 (emphasis supplied).

Accordingly, the FCC's treatment of ISP-bound traffic as solely interstate is prospectively binding on parties entering new interconnection agreements or re-negotiating old ones but does not reach back and destroy contrary agreements reached previously by CLECs and ILECs. *See Id.* at ¶ 30. The Court is aware of no prior or subsequent decision that contradicts that notion. *See, e.g.,* 2001 FCC Remand Order at ¶ 82 (any new payment mechanisms instituted to address compensation for calls terminating to ISPs apply "as carriers renegotiate expired or expiring inter-

connection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions").

In late August 2001, the DTE returned to the issue at hand by issuing DTE Order 97–116–F. Therein, the DTE concluded that the FCC's 2001 Remand Order did not invalidate the DTE's prior decisions or require that the DTE modify those orders. *Id.* at pp. 10–13. The DTE went on to address the issue of the contractual language of the interconnection agreements. *Significantly for purposes here, the DTE acknowledged that the FCC's rulings had not altered any contractual obligations between carriers, but the DTE nevertheless concluded that by operation of its own prior orders Verizon was not mandated by DTE decisions to pay reciprocal compensation. Id.* at 14. Moreover, the DTE concluded that the FCC's 2001 Remand Order "limits the [DTE's] participation in parties' actions with regard to interconnection agreements on a going-forward basis." *Id.* at 16. Thus, the DTE refused to revisit the issue of the contractual language itself, and instead repeated prior suggestions that MCI renew its complaint with the DTE but to do so based on contentions grounded in Massachusetts contract law, or other legal or equitable considerations. *Id.* at 16–17. The plaintiffs aver here that they amended their complaints, but there is no evidence before the Court that there has been further action by the DTE material to the instant dispute since then.[18]

## ANALYSIS

The parties' dispute over whether reciprocal compensation should be awarded for calls to ISPs is obviously not a unique one.

---

**18.** The Court notes that Global NAPs' parallel efforts to have the FCC preempt the DTE's authority to decide the instant issues was rejected by both the FCC and the U.S. Court of Appeals for the District of Columbia. *See Global NAPS, Inc. v. F.C.C.,* 291 F.3d 832, 2002 WL 1162430 (D.C.Cir.).

But the particular rulings by the DTE import a distinctiveness into this litigation.

■ As this Court addresses the conflict presented, the Court is mindful of its limited jurisdictional authority pursuant to Section 252(e)(6) of the Act. When, as here, the "resolution of... claims turns on whether the Act, or an FCC ruling issued thereunder precludes [a] Commission from ordering payment of reciprocal compensation, and there is no suggestion that such claims are frivolous, immaterial, or wholly insubstantial[,]" then the federal court has jurisdiction to hear those claims. *Verizon Md.,* — U.S. at —, 122 S.Ct. at 1759, *citing Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). This Court's review of the parties' claims is limited by the Supreme Court's continued adherence to the rule that a federal court reviewing a decision by a state telecommunications regulatory agency is limited to review of the agency's order for compliance with federal law. *Verizon Md.,* — U.S. at ———–——, 122 S.Ct. at 1758–59; *P.R. Tel. Co.,* 189 F.3d at 4, 8–9. *See also Global NAPS,* 291 F.3d 832, 2002 WL 1162430 at *5; *Southwestern Bell Tel. Co.,* 225 F.3d at 947–49.

In undertaking that limited review in the instant case, the Court must also consider the familiar standards governing summary judgment:

> Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no gen-

uine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). To be considered material, a disputed fact must have the potential to "affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505.

> The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden "may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. After such a showing, the "burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *De-Novellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (citing *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548). In the end, after examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, we are required to determine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

*Rochester Ford Sales, Inc. v. Ford Motor Co.,* 287 F.3d 32, 38 (1st Cir.2002).

**The motions for summary judgment**

As noted at the outset here, the plaintiffs' dispositive motions seek various rulings. Those requests may be grouped into two categories:

1. Declarations that the three orders issued by the DTE in May 1999, July 2000, and August 2001 violate federal law because the DTE failed

to consider whether the interconnection agreement entered by the parties give rise to reciprocal compensation for ISP-bound traffic, that the three orders issued by the DTE in May 1999, July 2000, and August 2001 are therefore void, and that the October 1998 DTE Order is valid an in effect; and

2. An injunction directing the DTE to undertake an analysis of the interconnection agreements to determine whether reciprocal compensation is warranted by the contractual language of the agreements with respect to ISP-bound traffic, prohibiting the DTE from enforcing the three orders issued by the DTE in May 1999, July 2000, and August 2001, and requiring that if the DTE finds that reciprocal compensation is not due for ISP calls per the parties' interconnection agreement, that the DTE must establish an alternative compensation mechanism pending the development and implementation of national rules by the FCC.

The Court addresses these requests in turn.

**The requested declarations**

■ The plain language of the FCC's rulings expressly stated that the rulings were not intended to be used as a foundation for overturning prior decisions by state regulatory commissions. *See, e.g.,* 14 F.C.C.R. at 3689, ¶¶ 20–24, 27, 16 F.C.C.R. at 9189, ¶ 82. Given that the 1999 FCC Ruling directly contravened the analysis relied upon by the DTE in deciding that reciprocal compensation was due to MCI in the 1999 DTE Order, the DTE may have acted properly in reconsidering in light of the FCC's ruling. But the propriety of that reconsideration does not equate with the notion that the 1999 FCC Order compelled a vacatur of the 1998 DTE Order, nor does it excuse the DTE from

declining to consider whether the express contractual language in the interconnection agreements gives rise to reciprocal compensation. Indeed, one consistency in all of the FCC's varied permutations on this issue has been the suggestion that states' commissions are to consider that basis in formulating their orders. *Id.* Such a result is consistent with the cooperative federalism that underlies the Act, and the critical role that the states' commissions are to play in effectuating the Act. Indeed, in that the Act is premised on the belief that free market competition rather than sovereign oversight is the better method of telecommunications regulation, it would be antithetical to the Act to simply ignore the fact that there is a contractual agreement between carriers that purportedly governs the issue of reciprocal compensation for calls to ISPs.

Moreover, in the 1999 FCC Order upon which the DTE purportedly relied, the FCC expressly stated that carriers "should be bound by their existing interconnection agreements, *as interpreted by state commissions.*" *Southwestern Bell,* 208 F.3d at 483, *citing* 1999 FCC Order (emphasis furnished). DTE, citing its own 1999 DTE Order, recognizes "the FCC's consoling notion that some states' orders might stand on state 'contractual principles or other legal or equitable' considerations" but avers that its 1998 DTE Order rested entirely on interpretation of federal law and regulatory guidance on whether a call to an ISP warrants reciprocal compensation. *See* DTE's Memorandum of Law in Support of its Cross–Motion for Summary Judgment, at pp. 12–13. That is precisely the point: DTE has only looked to federal law as the source of reciprocal compensation; it has not looked to whether the interconnection agreements give rise to reciprocal compensation as a matter of Massachusetts contract law. Thus, although the DTE is not required to reach the same result it reached in the 1998 DTE Order,

federal law requires that the DTE consider the contractual language in the parties' interconnection agreements to determine whether the parties contracted for reciprocal compensation.[19]

Accordingly, this Court FINDS that the DTE violated federal law by issuing orders in which it refused to consider whether, pursuant to Massachusetts law and other equitable and legal principles, the parties contracted in their interconnection agreements for reciprocal compensation for calls bound for ISPs.[20] Thus, this Court RECOMMENDS that the District Court DE-

CLARE that the orders issued by the DTE in May 1999, July 2000, and August 2001 violate federal law. Because the DTE properly considered that question in the 1998 DTE Order, the Court FURTHER RECOMMENDS that the District Court DECLARE that the 1998 DTE Order did not violate federal law. In light of this recommendation, the Court RECOMMENDS that the District Court ALLOW the motions for summary judgment by the plaintiffs, MCI and Global NAPS, and DENY the motions for summary judgment by Verizon and DTE.[21]

19. DTE and Verizon suggest, but do not establish, that the contractual language in the parties' interconnection agreements only implicates federal law as a source of reciprocal compensation. The Court takes no position on this suggestion, particularly given that the defendants do not address whether federal law requires the payment of reciprocal compensation per state contract law. The Court instead believes that the DTE must set forth a clear analysis of the issue based upon all relevant language in the interconnection agreements.

20. In so finding, the Court notes that the DTE seemed to understand such obligations in the 1998 Order, where it examined the specific language in the MCI–Verizon agreement, the industry custom, the parties' intent, and the state of federal telecommunications law on reciprocal compensation for ISP-bound calls at the time of contract formation. *Id.* at 10–14. Such findings seem to be in accordance with a not insignificant amount of authority. *See, e.g., Southwestern Bell Tel. Co. v. Brooks Fiber Communications. of Okla., Inc.,* 235 F.3d 493 (2000); *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tex., supra; Bellsouth Telecommuns., Inc. v. MCI Metro Access Transmission Servs., Inc., supra; Bellsouth Telecommunications Inc. v. ITC Deltacom Communications., Inc., supra; Ill. Bell Tel. Co., supra; Mich. Bell Telephone Co., supra; Cox Virginia Telcom, Inc. v. Verizon South, Inc.,* 2002 WL 959360 (F.C.C. May 10, 2002); *Starpower Communications, LLC v. Verizon South,Inc.,* 2002 WL 518062 (F.C.C. April 8, 2002).

21. Because the jurisdiction of this Court in this case extends only to a determination of

whether the DTE did or did not comply with federal law in carrying out its statutory obligations as a regulatory body, *Verizon Md., supra; P.R. Tel. Co., supra,* the Court FINDS that the District Court would exceed its proper jurisdictional authority if it were to declare that calls to ISPs are subject to reciprocal compensation. *See id. See also Bellsouth Telecommunications,* 278 F.3d at 1241–43 (refusing to issue a declaratory judgment on whether ISP-bound telephone calls are local traffic and, if so, whether carriers are entitled to reciprocal compensation for them). Such a declaration would be tantamount to a declaration of state contract law. *Bellsouth Telecommunications,* 278 F.3d at 1241–43. In so finding, the Court is aware that there seems to be a trend among the federal circuit courts that takes a more expansive view of jurisdiction. In this vein, the appellate courts permit district courts to consider de novo whether carrier interconnection agreements are in compliance with the Act and the Act's implementing regulations, and to consider state law determinations pursuant to the arbitrary and capricious standard. *See, e.g., Brooks Fiber Communs. of Okla.,* 235 F.3d at 497–98), *citing Southwestern Bell Tel. Co. v. Pub. Utils. Comm'n of Tex.,* 208 F.3d 475, 482 (5th Cir. 2000); *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999); *US West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1117 (9th Cir.1999). And although this Court recognizes the judicial efficiency and economy policy that drives the more expansive view of the Fourth, Fifth, Ninth and Tenth Circuits' decisions, the Court (and the parties) is bound by the First Circuit's contrary view as it was enunciated in *P.R. Tel. Co.* To the extent the

### The requested injunction

Although the request for injunctive relief is framed in the alternative by Global NAPs, MCI seeks that relief as part of its motion for summary judgment. The Court will therefore consider the request from both parties.

The standard in this Circuit for issuing an injunction is clear. A trial court faced with a motion for a preliminary injunction must weigh a quadrant of factors: 1) the movants' likelihood of success on the merits; 2) the imminent threat of irreparable harm, if any, to the movants if the injunction is not issued; 3) the balancing of the relevant hardships to the movants and non-movants; and, 4) the effect of the decision on the public interest. *See, e.g., Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 673–74 (1st Cir.1998); *Cablevision of Boston, Inc.*, 38 F.Supp.2d at 53. Although each factor is important and must be considered in its own right, the sine qua non of a preliminary injunction is the likelihood of success on the merits. *Demers v. Leominster School Dep't*, 96 F.Supp.2d 55, 58 (D.Mass.2000), *citing Weaver v. Henderson*, 984 F.2d 11, 12 n. 3 (1st Cir.1993). *See also Philip Morris*, 159 F.3d at 674; *Abbott Labs. v. Selfcare, Inc.*, 17 F.Supp.2d 43, 46 (D.Mass.1998).

The Court is persuaded that the plaintiffs will prevail on the merits to the extent their claims are based on DTE's failure to consider the language in the interconnection agreements that govern reciprocal compensation. Indeed, the Court has been underwhelmed by the defendants' suggestions that such review was not necessary because of the FCC's various rulings on the issue. Although the DTE might not find that there is a basis in federal law for reciprocal compensation to be granted to the plaintiffs, the FCC clearly and unequivocally contemplates that a state commission like the DTE would also look to the interconnection agreement itself.

Although the Court cannot adjudge the threat of irreparable harm if an injunction is not issued, it notes that the parties seem to agree that tens (if not hundreds) of millions of dollars are at issue here. In this weakening economy, and in light of the public reports of financial turmoil among high technology and telecommunications corporations like the parties here, there is clearly a risk of irreparable harm even if the parties have not established one here.

The prong which looks to the harm to the non-movants if the injunction issued must be bifurcated here. The Court sees no clear harm to the DTE. Indeed, the DTE has steadfastly refused to make the decision this Court now recommends. Its purported basis for that inaction—the evolving nature of federal law over the past few years—is now more solidified. Thus, there is no real hardship to the DTE beyond that which it should expect in the discharge of its duties in this arena.[22] The parties should address that issue with the

current cooperative jurisdictional framework creates a piecemeal approach to resolving the critical issues presented in litigation of the nature here, the remedy rests in the hands of legislature. *See Ill. Bell Tel. Co.*, 179 F.3d at 574.

**22.** To be sure, the DTE faced an unsettled and evolving body of law and regulations governing reciprocal compensation for ISP-bound calls that offered no clear cut answer to the questions posed by the parties' complaints. But it is precisely in such thickets that the public, these litigants, and others expect the DTE to forge a path. Similarly, the Court understands the DTE's preference for the parties to resolve this dispute themselves, see DTE 97–116–C at p. 29, but given the parties' apparent declination of DTE's invitation, DTE must now re-enter the dispute and interpret the agreements.

District Court as it considers this Court's recommendation.

Finally, the Court has considered the effect of the decision on the public interest. In the context of this case and the Act which drives it, the public's interest is wholly served by the issuance of an injunction directing the DTE to undertake an analysis of the interconnection agreements. It is the telecommunications consuming public in this District that the DTE and the carrier parties are to serve and, in the end, it is that public that will ultimately be responsible for paying for the carriers' services. The public has a critical interest in knowing that the decision-making that led to the costs they may or may not incur in using the Internet was a full, robust, and thorough one. ·

Accordingly, the Court RECOMMENDS that the District Court issue a PRELIMINARY INJUNCTION that directs the DTE to undertake an analysis of the interconnection agreements to determine whether those agreements give rise to reciprocal compensation for ISP-bound traffic, and that proscribes the DTE from enforcing the 1999 DTE Order, the 2000 DTE Order and the 2001 DTE Order until such time as that analysis is complete. The Court is not persuaded that additional injunctive relief is necessary at this juncture, including the request that if the DTE determines that reciprocal compensation is not due for ISP calls per the parties' interconnection agreement, that the DTE must establish an alternative compensation mechanism.[23]

### Conclusion

The Court RECOMMENDS that the District Court ALLOW the motion for summary judgment by the plaintiff Global NAPs, Inc. (Docket # 4), that the District Court ALLOW the motion for summary judgment by the plaintiff MCI–WorldCom Communications, Inc. (Docket # 25), and the District Court DENY the crossmotions for summary judgment by the defendants Verizon New England (Docket # 39) and DTE (Docket # 43). The Court further RESERVES to the District Court the motion for a status conference and oral arguments (Docket # 118).

### NOTICE TO THE PARTIES

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this proposed report and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

July 5, 2002.

---

**23.** Aside from the speculative nature of that request, the parties have not addressed the effect (if any) of subsequent FCC rulings on reciprocal compensation.